2010 OK CR 23

Carlos CUESTA–RODRIGUEZ, Appellant

v.

**STATE of Oklahoma, Appellee.**

No. D–2007–825.

Court of Criminal Appeals of Oklahoma.

Oct. 12, 2010.

---

219

Catherine Hammarsten, Cynthia Viol, Assistant Public Defenders, Oklahoma City, OK, attorneys for defendant at trial.

Steve Deutsch, Scott Rowland, Assistant District Attorneys, Oklahoma City, OK, attorneys for State at trial.

Andrea Digilio Miller, Assistant Public Defender, Oklahoma County Public, Defender's Office, Oklahoma City, OK, attorney for appellant on appeal.

W.A. Drew Edmondson, Oklahoma Attorney General, Robert Whittaker, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

*OPINION*

A. JOHNSON, Vice Presiding Judge.

¶ 1 Carlos Cuesta–Rodriguez was tried in the District Court of Oklahoma County, Case No. CF–2003–3216, and was found guilty of First Degree Murder in violation of 21 O.S. 2001, § 701.7. The jury imposed the death penalty after finding that the murder was especially heinous, atrocious, or cruel and that Cuesta–Rodriguez presented a continuing threat to society. *See* 21 O.S.2001, § 701.12(4) and (7). The Honorable Virgil C. Black, District Judge, who presided at trial, sentenced him accordingly. From this Judgment and Sentence, he appeals raising twenty-one claims of error. We find none of these claims merit relief and affirm the judgment and sentence.

*FACTS*

¶ 2 Olimpia Fisher, the victim in this case, and her adult daughter Katya Chacon lived with Cuesta–Rodriguez in a home that Fisher and Cuesta–Rodriguez had purchased together. In the year after the couple purchased the home, their relationship had become strained over Fisher's long working hours as a moving company packer and Cuesta–Rodriguez's fears that she was cheating on him. Cuesta–Rodriguez would question Fisher and Chacon whenever they left the home about where they were going and what they would be doing. Eventually, the relationship deteriorated to the point that Cuesta–Rodriguez wanted Fisher to move out and Fisher wanted Cuesta–Rodriguez to move out.

¶ 3 On May 20, 2003, Fisher went to the Santa Fe Station of the Oklahoma City Police Department to make a complaint of domestic abuse. Officer Jeffrey Hauck observed bruising on her right upper arm and stomach. When Fisher found out that Officer Hauck was going to take photographs of the bruising and that Cuesta–Rodriguez would be arrested, she ran out of the station.

¶ 4 On Friday May 31, 2003, Cuesta–Rodriguez tried calling Fisher on her cell phone. She answered and told him she was at work. Cuesta–Rodriguez had gone by her place of work, however, and knew she was not there. Believing she was cheating on him, he went home, drank some tequila, and went to bed.

¶ 5 Katya Chacon came home to a dark house at approximately 10:00 p.m. She saw an empty bottle of tequila and a note next to it. The note, written on the back of an envelope, said "F—— you bitches and puntas, goodbye" (Tr. Vol.2, 381). She thought she was alone in the house, but when she heard Cuesta–Rodriguez cough in the other room, she tried to telephone her mother. Unable to contact Fisher by telephone, Katya left the house and joined her as she was getting off work. They ate a late meal at a McDonald's restaurant, and went home. They initially planned to pack and leave, but decided to remain in the house overnight. Katya slept in her own bedroom and Fisher slept in a third bedroom.

¶ 6 Around 4:30 a.m., Katya woke up and heard Fisher and Cuesta–Rodriguez arguing. Katya went into the bedroom where the two were fighting and persuaded Fisher to come to Katya's bedroom in the hope that Cuesta–Rodriguez would leave them alone. Cuesta–Rodriguez followed the women into Katya's bedroom while continuing to argue loudly with Fisher. Fisher picked up a telephone, but Cuesta–Rodriguez snatched it out of her hand and threw it away. At the same time, he pulled out a double-barreled .45 caliber pistol loaded with two .410 shotgun shells and blasted Fisher in the right eye.[1] With her mother shot, Katya retrieved a baseball bat from under the bed and tried to hit Cuesta–Rodriguez in the hand. Cuesta–Rodriguez grabbed the bat as Katya swung it and threw it to the floor.[2] Katya ran from the house and was able to call 911 from a neighbor's residence. According to Cuesta–Rodriguez's statement to police, Fisher was still alive and conscious after he shot her so

---

1. Katya Chacon testified that the gunshot hit the right side of Fisher's face.

2. Cuesta–Rodriguez told police that Katya beat him with a baseball bat before he shot Fisher. Cuesta–Rodriguez also told police that the gun

went off as Fisher attempted to wrestle it from him. Cuesta–Rodriguez said the shot hit near her eyes, but thought it might have hit near her left eye.

he took her to his bedroom where, despite having an eye blown out, Fisher continued to fight and struggle.

¶ 7 The first police officers arrived on the scene at approximately 4:41 a.m., within two minutes of being dispatched by 911. While one officer took information from Katya near the neighbor's house from where she had called 911, other officers approaching Cuesta–Rodriguez's and Fisher's house could hear Fisher screaming and banging on a bedroom window as if she was trying to escape. The windows and doors to the house were covered with burglar bars that not only prevented her escape, but also prevented entry by police. The officers' first attempt at entry by kicking in the front door failed. While attempting to get through the front door, officers heard a gunshot and Fisher's screams stopped.

¶ 8 Certain that Fisher was no longer alive, and certain that Cuesta–Rodriguez was armed, police summoned their tactical team. In the meantime, a police hostage negotiator attempted to make telephone contact with Cuesta–Rodriguez and used a loudspeaker in an attempt to convince him to come out. Eventually, the tactical team forced their way through the front door burglar bars with some difficulty using a specialized hydraulic tool called a jam-ram. Cuesta–Rodriguez was arrested and taken to the police station. He gave statements to detectives that day and the next day. In both interviews he admitted shooting Fisher, although he claimed the first shot was accidental. Photographs of Fisher's face taken at the scene, and introduced as trial exhibits, showed severe injuries centered on her eyes.[3]

¶ 9 Other facts will be discussed as necessary with Cuesta–Rodriguez's individual claims of error.

***

3. In addition to being the situs of Fisher's injuries, Fisher's eyes came up in another context. According to the testimony of Fisher's former boyfriend, when Fisher terminated their relationship in favor of Cuesta–Rodriguez, Fisher said that she had "put her eyes on somebody else" (Tr. Vol.2, 347–348). The ex-boyfriend stated he was familiar with Fisher's use of this unusual phrase because she previously told him that if

*DISCUSSION*

**1.**

### Jury Instruction: Voluntary Intoxication

¶ 10 Cuesta–Rodriguez claims that his constitutional rights to due process and to present a defense were denied by the trial court's refusal to issue a jury instruction on the defense of voluntary intoxication.

¶ 11 This Court reviews a trial court's decision on whether to instruct a jury on the defense of voluntary intoxication for an abuse of discretion. *Fitzgerald v. State,* 1998 OK CR 68, ¶ 43, 972 P.2d 1157, 1174. Before a voluntary intoxication instruction is given, the evidence must be sufficient to establish a prima facie case that the defendant was intoxicated to the point he was unable to form deliberate intent to kill. *Malone v. State,* 2007 OK CR 34, ¶ 22, n. 48, 168 P.3d 185, 197, n. 48. Where the trial court finds insufficient evidence has been introduced to show that the defendant was so intoxicated that his mental powers were overcome and he was unable to form criminal intent, the court may either reject the instruction or instruct the jury that intoxication was not a defense to the crime. *Fitzgerald,* 1998 OK CR 68, ¶ 43, 972 P.2d at 1174; *see also Miller v. State,* 1977 OK CR 189, ¶ 18, 567 P.2d 105, 109 (holding that for voluntary intoxication to be defense to first-degree murder, defendant must be so intoxicated as to be incapable of forming any criminal intent).

¶ 12 The evidence in this case showed that Cuesta–Rodriguez did consume some tequila several hours before the murder. Under questioning by police, for example, Cuesta–Rodriguez said that he consumed two or three drinks of tequila, but denied that he consumed enough to make him drunk.[4] Katya Chacon described Cuesta–Rodriguez as "stupid drunk" on the night of the murder, but also testified that he was steady on his

***

she put her eyes on somebody else, that meant she was "interested in him" (Tr. Vol.2, 347–348).

4. In his statement to police, Cuesta–Rodriguez insisted that he acted out of anger toward Fisher as a result of his belief that she was seeing other men, not as a result of having consumed alcohol.

feet and talking clearly. Detective Dupy testified that Cuesta–Rodriguez smelled of alcohol at 9:15 a.m., four hours after the shooting, but stated in his report that Cuesta–Rodriguez appeared only slightly intoxicated. This evidence may certainly support an inference that Cuesta–Rodriguez was intoxicated, but it does not rise to the level of making a prima facie showing that Cuesta–Rodriguez was so intoxicated that he was incapable of forming criminal intent. *See Charm v. State,* 1996 OK CR 40, ¶ 13, 924 P.2d 754, 761 (finding that where evidence concerning defendant's level of intoxication was conflicting, there was insufficient evidence of impairment to raise reasonable doubt as to defendant's ability to form requisite criminal intent to commit first-degree murder).[5] This conclusion is well supported by the fact that Cuesta–Rodriguez remembered events well enough to give police a detailed account of the shooting and the circumstances surrounding it. *See Valdez v. State,* 1995 OK CR 18, ¶¶ 56–58, 900 P.2d 363, 379 (explaining that defendant who is able to give detailed, lucid account of circumstances of crime is hard pressed to argue that he was significantly intoxicated at the time of the incident). The trial court did not abuse its discretion by denying Cuesta–Rodriguez's request for a jury instruction on the defense of voluntary intoxication.

**2.**

**Exclusion of Expert Testimony**

■■■ ¶ 13 Cuesta–Rodriguez claims that the trial court violated his rights to present a defense and to a fair trial by failing to allow psychologist, Dr. James Choca, to testify in his defense during the guilt phase of the trial. According to Cuesta–Rodriguez, Dr. Choca would have testified about the nega-

tive effect of combining alcohol and the steroid diprospan on Cuesta–Rodriguez's mental state; that Cuesta–Rodriguez was suffering from depression at the time of the murder, and would have concluded that the depression created a psychotic belief system in Cuesta–Rodriquez's mind that resulted in delusions. Cuesta–Rodriguez contends that this testimony was relevant to his voluntary intoxication defense and to the lesser included offense of manslaughter upon which the jury was also instructed.

■■ ¶ 14 We review a trial court's evidentiary rulings for an abuse of discretion. *Jackson v. State,* 2006 OK CR 45, ¶ 48, 146 P.3d 1149, 1165. To constitute an abuse of discretion, the trial court's conclusion or judgment must be clearly against the logic and effect of the facts presented. *Perryman v. State,* 1999 OK CR 39, ¶ 11, 990 P.2d 900, 904.

¶ 15 In this instance, the trial court judge sustained the State's objection to Dr. Choca's first stage testimony about alcohol, diprospan, and depression as part of the voluntary intoxication defense by finding the evidence of alcohol impairment insufficient to raise the voluntary intoxication defense. We agree. We can find no evidence in the record of the first stage proceeding showing that Cuesta–Rodriguez ingested the steroid diprospan.[6] On this record, therefore, there simply was no basis for the proposed testimony about the combined effects of diprospan and alcohol as part of a voluntary intoxication defense. Furthermore, we cannot find that the proposed testimony about Cuesta–Rodriguez's depression was relevant to a voluntary intoxication defense to the first degree murder charge or to the lesser included offense of

---

**5.** In Cuesta–Rodriguez's reply brief and at oral argument, counsel for Cuesta–Rodriguez asserted that detectives ended their initial interview with Cuesta–Rodriguez because he was too intoxicated to continue. Cuesta–Rodriguez does not point to any portion of the trial record where this information can be found. To the contrary, Detective Carson specifically denied terminating the interview for intoxication, and stated instead that the interview was stopped because Cuesta–Rodriguez was sleepy and not feeling well. Detective Dupy testified that the interview was terminated

to give Cuesta–Rodriguez the opportunity to get some sleep. According to Dupy, although Cuesta–Rodriguez appeared slightly intoxicated, he also appeared emotionally drained, tired, and slow to respond.

**6.** Dr. Choca testified during the second stage and stated that Cuesta–Rodriguez told him that on the day of the murder he injected himself with diprospan.

manslaughter.[7] *See e.g., Mott v. State,* 1951 OK CR 68, 94 Okla.Crim. 145, 232 P.2d 166, 179 (holding that when defendant claims mental faculties have been destroyed by chronic intoxication, appropriate defense is insanity, not voluntary intoxication).

¶ 16 Moreover, we are not convinced that Dr. Choca was qualified to testify as to the effects of combining alcohol and the steroid diprospan. Dr. Choca testified during the sentencing phase of the trial. His testimony there reveals that he is a psychologist with a Ph.D. There is nothing in the record showing that Dr. Choca had any specialized knowledge or training in toxicology or medicine that would qualify him as an expert in the field of drug interactions in the human body.

¶ 17 Given the inadequate factual basis for the voluntary intoxication defense, the lack of evidence that Dr. Choca was even qualified to opine on the subject of drug-alcohol interactions, and the lack of relevance of the testimony to the lesser included offense of heat of passion manslaughter, the trial court did not abuse its discretion by excluding Dr. Choca's testimony during the guilt phase of the trial.

### 3.

### Evidentiary Issues

¶ 18 Cuesta–Rodriguez contends that the trial court erred when it denied his motion to dismiss the case based on his claims that the Oklahoma City Police Department acted in bad faith by failing to collect and preserve certain evidence from the crime scene. Specifically, Cuesta–Rodriguez alleges that the police acted in bad faith by not saving empty tequila bottles that were shown in photographs of the scene and not saving the "goodbye note" that Katya Chacon read before she fled the house. According to Cuesta–Rodriguez, the liquor bottles and the note were key pieces of exculpatory evidence that were essential to his defense.

¶ 19 We review a district court's denial of a motion to dismiss for an abuse of discretion. *Bewley v. State,* 1985 OK CR 11, ¶ 9, 695 P.2d 1357, 1359. An abuse of discretion here is "any unreasonable, unconscionable and arbitrary action taken without proper consideration of the facts and law pertaining to the matter submitted." *See Williams v. State,* 2008 OK CR 19, ¶ 27, 188 P.3d 208, 217 (quoting *Harvey v. State,* 1969 OK CR 220, ¶ 9, 458 P.2d 336, 338), *cert. denied,* 555 U.S. ——, 129 S.Ct. 1529, 173 L.Ed.2d 660 (2009). An abuse of discretion has also been described as "a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented." *Stouffer v. State,* 2006 OK CR 46, ¶ 60, 147 P.3d 245, 263 (citation and quotation omitted).

¶ 20 The State has a duty under the Due Process Clause of the Fourteenth Amendment to preserve evidence that might be expected to play a significant role in the suspect's defense. *California v. Trombetta,* 467 U.S. 479, 488–89, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984). Such evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* Neither condition is met in this case. "[U]nless a defendant can show bad faith by the police, destruction of potentially useful evidence does not constitute a due process violation." *Torres v. State,* 1998 OK CR 40, ¶ 24, 962 P.2d 3, 13.

¶ 21 Cuesta–Rodriguez did not explain to the district court, nor does he explain here, how the tequila bottles themselves would have been any more exculpatory than the photographs of the bottles that were presented at trial. The photographs of the two bottles, one of which was a tequila bottle,

---

7. The trial court's decision to instruct the jury on heat of passion manslaughter as a lesser included offense was based on evidence showing that Cuesta–Rodriguez was angry at Fisher for cheating on him. According to the trial court:

I'm going to give you the heat of passion because he says—the first thing he ever says, she's cheating on me, cheating on me, over and over again, and that seems to be the whole gist of this, that he was angry because of some real or imagined infidelity on the part of the victim.

(Tr. Vol.5, 888).

corroborated Cuesta–Rodriguez's statement to police that he had two or three shots of tequila the evening before the murder. Any further exculpatory value is not apparent on the face of this record, and likely was not apparent to officers at the scene because, as Detective Carson testified, the presence of liquor bottles is commonplace at crime scenes.

¶ 22 With regard to the note, Katya Chacon testified that she fled the house after she read it, presumably leaving it in Cuesta–Rodriguez's control. Detective Carson testified that if he had found the note, he would have preserved it because it had obvious inculpatory value. Based on this testimony, it is not clear that police ever took possession of the note despite looking for it. Additionally, while the note's inculpatory value is obvious, its exculpatory value is not. Cuesta–Rodriguez did not explain to the district court, nor does he explain here, how the note, even if it had been found by police, was exculpatory, or why the paper itself would have been any more exculpatory than the testimony of Katya Chacon who read it.

¶ 23 Because Cuesta–Rodriguez failed to meet his burden of showing that the note and tequila bottles possessed exculpatory value and because he failed to show that the photographs of the bottles and testimony about the note were not reasonably comparable substitutes for the items themselves, we do not find the district court abused its discretion in denying Cuesta–Rodriguez's motion to dismiss.

### 4.

### Other Crimes Evidence

■■■ ¶ 24 Cuesta–Rodriguez claims that he was denied a fair trial by the trial court's admitting evidence of other crimes. He complains about the testimony of Officer Jeffrey Hauck who told the jury that he observed bruising on Olimpia Fisher when she reported an assault to him on May 20, 2003, eleven days before she was murdered.

¶ 25 We review a trial court's evidentiary rulings for an abuse of discretion. *Jackson,* 2006 OK CR 45, ¶ 48, 146 P.3d at 1165. To constitute an abuse of discretion, the trial court's conclusion or judgment must be clearly against the logic and effect of the facts presented. *Perryman,* 1999 OK CR 39, ¶ 11, 990 P.2d at 904.

¶ 26 Title 12 O.S.2001, § 2404(B) governs the admission of evidence of other crimes, wrongs, or bad acts, and specifically prohibits evidence intended to prove a character trait of a person in order to show the person acted in conformity with that trait. Other crimes evidence is permissible, however, to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.*

■■■ ¶ 27 Evidence of previous altercations between spouses is relevant to the issue of intent. *Hooker v. State,* 1994 OK CR 75, ¶ 25, 887 P.2d 1351, 1359. *See also, Duvall v. State,* 1991 OK CR 64, ¶ 6, 825 P.2d 621, 626 ("[t]he relevance of testimony showing ill feeling, threats, or similar conduct by one spouse toward another in a marital homicide case has been established by this Court"); *Lamb v. State,* 1988 OK CR 296, ¶ 10, 767 P.2d 887, 891 ("[e]vidence of previous altercations between an appellant and a deceased is relevant to establish motive, malice, or intent, 'even though such evidence constitutes evidence of another crime'")(quoting *Villanueva v. State,* 1985 OK CR 8, ¶ 7, 695 P.2d 858, 860). Because evidence of Cuesta–Rodriguez's prior attack on Fisher was relevant to show motive and intent, the trial court did not abuse its discretion in admitting it.

### 5.

### Autopsy Result as Testimonial Hearsay

¶ 28 Cuesta–Rodriguez claims that his Sixth Amendment right to confront the witnesses against him was violated by the admission of testimonial hearsay evidence, specifically information contained in the report from the autopsy on Olimpia Fisher's body. Dr. Fred Jordan, the medical examiner who performed the autopsy on Fisher had retired by the time of trial and Dr. Jeffrey Gofton, the Chief Medical Examiner, testified in his place. Dr. Gofton testified regarding the examination of the body conducted by Dr. Jordan and gave his own opinions on Fisher's injuries and cause of death based on Dr.

Jordan's observations as recorded in his autopsy report. Cuesta–Rodriguez contends that because the autopsy report was prepared by Dr. Jordan, not Dr. Gofton, he was denied his constitutional right to confront Dr. Jordan and challenge his findings and conclusions contained in the autopsy report.

¶ 29 A trial court's ruling admitting or excluding evidence is reviewed for an abuse of discretion. *Jackson*, 2006 OK CR 45, ¶ 48, 146 P.3d at 1165.

¶ 30 In *Crawford v. Washington*, 541 U.S. 36, 50–51, 124 S.Ct. 1354, 1364, 158 L.Ed.2d 177 (2004), the Supreme Court held that the Sixth Amendment confrontation right applies not only to in-court testimony, but also to testimonial hearsay (i.e., out-of-court statements that are testimonial in nature). The Confrontation Clause forbids the admission of testimonial hearsay unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. *Id.* at 68, 124 S.Ct. at 1374. Testimonial statements are not limited to formal statements made to government officers, but also include pretrial statements that a declarant would reasonably expect to be used prosecutorially. *Id.* at 51, 124 S.Ct. at 1364.

## A. The Autopsy Report

¶ 31 Cuesta–Rodriguez's claim is premised on the assertion that Dr. Jordan's autopsy report was testimonial hearsay under *Crawford.* The State argues, on the other hand, that because autopsy reports are prepared in the ordinary course of business by the Medical Examiner's Office they are non-testimonial because *Crawford* explicitly stated that business records are non-testimonial by their nature. The State's position is founded on the idea that 63 O.S.Supp.2004, § 949(A)(1)(a) and 63 O.S.2001, § 938(A) require the medical examiner to conduct investigations and prepare autopsy reports under a number of statutorily enumerated circumstances, not just circumstances in which the report might be used in a criminal prosecution. Therefore, according to the State, autopsy reports are admissible under the business record exception to the hearsay rule at 12 O.S.2001, § 2803(6).

¶ 32 In *McCarty v. State*, 1998 OK CR 61, ¶¶ 85–89, 977 P.2d 1116, 1136–37, *conviction reversed on other grounds*, 2005 OK CR 10, 114 P.3d 1089, this Court accepted the business record rationale and held that a Chief Medical Examiner could properly testify to the autopsy findings of another medical examiner, even absent a finding of unavailability, under the business record exception to the hearsay rule codified at 12 O.S.1991, § 2803(6). *McCarty* was decided, however, before the United States Supreme Court's 2004 decision in *Crawford* and its more recent decision in *Melendez–Diaz v. Massachusetts*, 557 U.S. ——, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), which was decided while this appeal was pending.

¶ 33 In *Melendez–Diaz*, the Supreme Court held that reports prepared by analysts at a state crime laboratory declaring that a substance was cocaine were testimonial statements, and that the analysts who prepared the reports were witnesses for purposes of the Sixth Amendment. *Id.* at 2532. Thus, the Court concluded that absent a showing that the analysts were unavailable to testify and that the defendant had a prior opportunity to cross-examine them, the defendant was entitled to confront the analysts at trial. *Id.* In *Melendez–Diaz*, the Supreme Court rejected the contention that public or business records are categorically nontestimonial. "Documents kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status. But that is not the case if the regularly conducted business activity is the production of evidence for use at trial." *Id.* at 2538 (internal citation omitted). With specific reference to the laboratory reports at issue in that case, the Court added:

> Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial. Whether or not they qualify as business or official records, the analysts' statements here—prepared specifically for use at petitioner's trial—

were testimony against petitioner, and the analysts were subject to confrontation under the Sixth Amendment. *Id.* at 2539–40. In the course of rejecting the asserted Confrontation Clause exception for business and public records, the Court wrote that "whatever the status of coroner's reports at common law in England, they were not accorded any special status in American practice." *Id.* at 2538.

¶ 34 In Oklahoma, a medical examiner is required by law to investigate deaths under a variety of circumstances including violent deaths and deaths under suspicious circumstances. 63 O.S.2001, § 938(A). The medical examiner must promptly turn over to the district attorney copies of all records relating to a death for which the medical examiner believes further investigation is advisable. 63 O.S.Supp.2004, § 949(A)(2). On completion of his investigation, a medical examiner must send copies of his reports to investigating agencies with an official interest in the case. 63 O.S.2001, § 942. Further, "[a]ny district attorney or other law enforcement official may, upon request, obtain copies of such records or other information deemed necessary to the performance of such district attorney's or other law enforcement official's official duties." 63 O.S.2001, § 938(A)(2). Given this statutory framework, it is obvious

that a medical examiner's words recorded in an autopsy report involving a violent or suspicious death could constitute statements that the medical examiner should reasonably expect to be used in a criminal prosecution and therefore under the *Crawford* and *Melendez–Diaz* framework would be testimonial for Sixth Amendment confrontation purposes.

¶ 35 In this case, the circumstances surrounding Fisher's death warranted the suspicion that her death was a criminal homicide. Under these circumstances, therefore, it is reasonable to assume that Dr. Jordan understood that the report containing his findings and opinions would be used in a criminal prosecution. Dr. Jordan's autopsy report was a testimonial statement, and Dr. Jordan was a witness within the meaning of the Confrontation Clause.[8]

## B. Dr. Gofton's Testimony

¶ 36 Prior to Dr. Gofton testifying, Cuesta–Rodriguez objected on the grounds that the autopsy report was prepared by Dr. Jordan who would not be subject to cross-examination. After hearing argument from counsel, the district court judge overruled the objection without explanation other than the following statement:

---

8. At least three appellate courts have applied *Melendez–Diaz* to cases involving autopsy reports and substitute medical examiners as expert witnesses. All three courts found that autopsy reports of homicides were testimonial and that the medical examiner who wrote the report was a witness for Confrontation Clause purposes. *See Wood v. State*, 299 S.W.3d 200, 209–210 (Tex.App.2009)(holding that under *Melendez–Diaz*, autopsy report involving death that was suspected homicide was testimonial statement and that medical examiner who wrote report was witness within meaning of Confrontation Clause); *Commonwealth v. Avila*, 454 Mass. 744, 912 N.E.2d 1014, 1029–1030 (2009)(holding that medical examiner who did not perform victim's autopsy but who, in preparation for testifying, reviewed autopsy report and related materials of medical examiner who performed autopsy, is not permitted, under Confrontation Clause, on direct examination, to recite or otherwise testify about underlying factual findings of unavailable medical examiner as contained in autopsy report; the examiner's testimony must be confined to his or her own opinions and, as to these, the examiner is available for cross-examination); *State v. Locklear*, 363 N.C. 438, 681 S.E.2d 293, 304–05

(2009)(holding that autopsy report is testimonial and therefore inadmissible under *Melendez–Diaz* and *Crawford* absent showing that forensic analyst was unavailable to testify and defendant had prior opportunity to cross-examine). *See also, State v. Martin*, 291 S.W.3d 269, 283–88 (Mo.App.2009)(holding that error in allowing medical examiner who did not conduct autopsy to testify about report of medical examiner who did conduct autopsy and admitting autopsy report to show that victim died of smoke inhalation was harmless, despite claim that autopsy was testimonial evidence and that medical examiner's testimony therefore violated Confrontation Clause, given that means of victim's death was not disputed at trial, and testimony was cumulative of other admissible evidence of forensic toxicologist that victim's toxicology report revealed fatal amounts of carbon monoxide in her body). *But see, People v. Lewis*, 287 Mich.App. 356, 788 N.W.2d 461 (2010) (finding no Confrontation Clause violation under *Melendez–Diaz* where substitute medical examiner testified about autopsy report prepared by another medical examiner on grounds that state statute required autopsy reports under certain circumstances regardless of whether criminal prosecution is contemplated).

For the purpose of the record, I'm going to admit the testimony, allow the testimony, and it's my request to the Court of Criminal Appeals that, if they get this case, that they clarify by published opinion the proper procedure, if they agree or disagree as to what occurred.

(Tr. Vol.3, 560).

¶ 37 After Dr. Gofton introduced himself to the jury and briefly summarized his education and experience, he was asked by the prosecutor if he had reviewed the records of the autopsy performed by Dr. Jordan. Over defense counsel's objections the State introduced three diagrams from Dr. Jordan's report that depicted the locations and types of injuries he observed on Fisher's body. Dr. Gofton explained to the jury the nature of the injuries noted on the diagrams and recited other observations mentioned in Dr. Jordan's report. He concluded that a firearm injury to the head was the cause of death and opined that among several possibilities, the method of death was most likely choking on blood that had entered the airway from bone fracturing in the nasal area. According to Dr. Gofton, Fisher would have lost consciousness in a matter of seconds to minutes and could have taken as long as eight minutes to aspirate on the blood. Gofton also opined that of the two gunshot wounds to Fisher's head, the gunshot to the right side of the face and eye was the less severe wound, probably occurred first, and was non-fatal. He also offered the opinion that the second gunshot, the one to the left side of the face and eye, was the likely cause of death because it fractured the skull and nasal bone causing brain injuries and bleeding into the airway.

¶ 38 Although we agree with Cuesta–Rodriguez that Dr. Jordan's autopsy report was testimonial, this position does not resolve the issue because the autopsy report was not introduced in evidence. Instead, Dr. Gofton was called to testify to his own opinions regarding Fisher's injuries and death, and the contents of the autopsy report were used by Dr. Gofton to show the basis for his opinions.

¶ 39 Although neither the prosecutor nor the trial court expressly cited the evidence rules at 12 O.S.Supp.2002, §§ 2703 and 2705, it is apparent from the trial record that these rules were the basis upon which Dr. Gofton's testimony was offered and admitted. Under § 2703, an expert witness may base an opinion on facts or data that are not admissible in evidence, provided that the inadmissible facts or data are of a type reasonably relied on by experts in the particular field. Under this rule, an expert may base an opinion solely on inadmissible hearsay. *Lewis v. State*, 1998 OK CR 24, ¶ 19, 970 P.2d 1158, 1166–67. Under § 2705, an expert witness may generally disclose on direct examination the facts or data underlying his opinion. *Id.* Under certain limited circumstances, an expert witness may disclose the facts and data underlying his opinion even if they are inadmissible as evidence. 12 O.S.Supp.2002, § 2705(d); *Lewis*, 1998 OK CR 24, ¶ 19, 970 P.2d at 1166–67. Nevertheless, evidence rules cannot trump the Sixth Amendment's right of confrontation. *See Crawford*, 541 U.S. at 61, 124 S.Ct. at 1370 ("[W]e do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence"). Confrontation "is one means of assuring accurate forensic analysis" and "is designed to weed out not only the fraudulent analyst, but the incompetent one as well." *Melendez–Diaz*, 129 S.Ct. at 2536–37. Consequently, while Dr. Gofton's opinions were admissible because he was available for cross-examination about those opinions, Cuesta–Rodriguez was denied the opportunity to confront Dr. Jordan in order to test his competence and the accuracy of his findings contained in the hand-annotated diagrams and the autopsy report whose contents Dr. Gofton disclosed to the jury. The trial court erred by admitting the autopsy diagrams drawn by Dr. Jordan and Dr. Gofton's testimony about what Dr. Jordan said in his autopsy report. *Cf. Marshall v. State*, 2010 OK CR 8, ¶¶ 28–31, 232 P.3d 467, 475–76 (finding confrontation error where DNA expert testified to contents of DNA report prepared by nontestifying expert who wrote report and defendant had no prior opportunity to cross-examine author of report).

## C. Harmless Error

¶ 40 Because there was constitutional error, we must reverse Cuesta–Rodriguez's conviction unless we are satisfied beyond a reasonable doubt that the error did not contribute to the conviction or punishment. *Marshall,* 2010 OK CR 8, ¶ 31, 232 P.3d 467, 475–76; *see also Mayes v. State,* 1994 OK CR 44, ¶ 67, 887 P.2d 1288, 1307 (citing *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). That is, a violation of a defendant's confrontation right does not require automatic reversal where the weight of the rest of the evidence is overwhelming and the prejudicial effect of the inadmissible evidence is insignificant. *Id.* In this instance, Dr. Gofton's opinions that the first gunshot to Fisher's face was not fatal, that she died by choking on blood caused by the second gunshot wound, and that Fisher did not die immediately, but may have lingered for up to eight minutes did not violate Cuesta–Rodriguez's confrontation right. The confrontation error was Dr. Gofton's disclosure of the underlying information contained in Dr. Jordan's testimonial autopsy report. We conclude, however, that the error was harmless.

¶ 41 The out-of-court testimonial statements disclosed by Dr. Gofton consisted of his recitation of Dr. Jordan's conclusions that the manner of Fisher's death was homicide and the cause of death was a firearm wound to the head. Dr. Gofton also recited Dr. Jordan's descriptions of the injuries to Fisher's head and face to include Jordan's observations that: (1) Fisher's eye sockets had been shattered; (2) her nasal bone and skull had been fractured by the second gunshot; (3) she had substantial amounts of blood in her lungs and airway; and (4) that her brain had "subarachnoid bleeding," "contusive hemorrhages," but no swelling. From these observations, Dr. Gofton testified that in his opinion the gunshot to the right eye occurred first, but caused a non-fatal injury. In Gofton's opinion, the second gunshot went to the left eye and produced the fatal injury. Dr. Gofton opined on several ways in which the gunshot to the left eye might have caused Fisher to die, but concluded the most likely cause was bleeding through the shattered nasal bone and skull that entered the airway and lungs and caused her to choke to death on blood. In Gofton's opinion, when choking to death in this manner a person could remain conscious for a period of time of seconds to minutes, and in this instance, Fisher might have remained conscious for up to eight minutes.

¶ 42 With regard to the jury's guilt or innocence determination, Gofton's testimony was harmless because even if Dr. Gofton had not testified, the jury still had ample evidence to conclude on its own that Fisher's death was a homicide (i.e., the killing of one human being by another) [9] and that the cause of death was a firearm injury to her face and head. This evidence included (1) Katya Chacon's testimony that she saw Cuesta–Rodriguez shoot Fisher in the face; (2) Cuesta–Rodriguez's admissions to police that he shot Fisher; (3) testimony of officers that they heard a woman's screams from inside the house but then silence after a gunshot; and (4) photographs of Olimpia Fisher's face taken at the crime scene showing massive injuries to her head and face with the injuries centered on the eyes.

¶ 43 Similarly, with regard to sentencing, the error was also harmless. The bulk of Gofton's testimony concerning the details of Fisher's death involved a recitation of Dr. Jordan's autopsy observations and Gofton's own opinions based on those observations that Fisher was able to remain conscious some seconds or minutes after the second, ultimately fatal, gunshot. This was potentially relevant to proving the heinous, atrocious, or cruel aggravator in the sentencing phase by showing that Fisher consciously suffered before she died.[10]

9. 21 O.S.2001, § 691(A).

10. *See Browning v. State,* 2006 OK CR 8, ¶ 47, 134 P.3d 816, 841–42 ("The heinous, atrocious or cruel aggravating circumstance requires proof beyond a reasonable doubt that the victim's murder was preceded by torture or serious physical abuse, including great physical anguish or extreme mental cruelty. A finding of serious physical abuse requires proof that the victim consciously suffered before death").

¶ 44 In determining whether a Confrontation Clause violation is harmless error, we must consider the importance of the witness's testimony to the State's case, whether the testimony was cumulative of other evidence, the presence or absence of evidence corroborating or contradicting the out-of-court statements on material points, and the overall strength of the prosecution's case. *Littlejohn v. State*, 2004 OK CR 6, ¶ 28, 85 P.3d 287, 297–98 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986)).

¶ 45 Dr. Gofton's testimony about Fisher's external injuries, as described in Dr. Jordan's report and accompanying hand-drawn diagrams were largely cumulative of the same injuries depicted in photographs of Fisher's face and head taken at the murder scene that were properly entered into evidence with the testimony of Detective John Fiely. These photographs, more detailed and graphic than Dr. Jordan's diagrams, clearly depicted Fisher's shattered eye sockets, skull, and nasal bones. Additionally, Dr. Jordan's annotated diagram showing bruises elsewhere on Fisher's body were cumulative to some extent to ·Officer Jeffrey Hauck's testimony in which he told jurors that he saw bruises on Fisher's upper right arm and stomach when she initiated a domestic abuse complaint approximately two weeks before her death. Moreover, Dr. Jordan's observation of bleeding and bruising in the brain, but no swelling, was not of any significance to the State's case.

¶ 46 Furthermore, even if Dr. Gofton's testimony is discounted in its entirety, there was still more than sufficient evidence for the jury to conclude that Fisher consciously suffered before her death. As discussed at greater length below, the testimony of police officers and Katya Chacon, as well as Cuesta–Rodriguez's statements to police showed that when Cuesta–Rodriguez fired the first blast from his pistol into Fisher's right eye, she was not rendered unconscious. Instead, this evidence showed that she continued struggling for at least seven minutes until Cuesta–Rodriguez delivered the fatal shot to her left eye. During this interval, with her right eye blown out, the jury could have reasonably concluded that Fisher consciously experienced great physical and mental suffering. Consequently, even if Dr. Gofton's testimony about how long Fisher may have remained conscious after the second gunshot is eliminated from consideration, there was enough remaining evidence to show conscious suffering in the interval between the first and second shots.

¶ 47 In conclusion, Dr. Jordan's autopsy report was a testimonial statement. Dr. Jordan was therefore a witness within the meaning of the Confrontation Clause as construed in *Crawford* and *Melendez–Diaz*. Under the circumstances of this case, therefore, the disclosure of the contents of Dr. Jordan's autopsy report by Dr. Gofton violated Cuesta–Rodriguez's right of confrontation. We are satisfied beyond a reasonable doubt, however, that the disclosure of the information taken from the autopsy report did not contribute to Cuesta–Rodriguez's conviction or punishment.[11]

### 6.

### Discovery

¶ 48 Cuesta–Rodriguez claims the State failed to comply with the Oklahoma Criminal Discovery Code at 22 O.S.Supp.2002, § 2002, by not providing notice that Detective Steve Carson would be a witness at trial and by not providing a summary of his anticipated testimony. Specifically, Cuesta–Rodriguez claims that Detective Carson was not listed in the State's Summary of Witness Testimony that was filed on October 21, 2004. This claim is clearly refuted by the record. Page five of the State's Summary of Witness Testimony lists Detective Carson as a witness and provides a summary of his anticipated testimony as follows:

> medical examiner to prepare his or her own report and testify from it. Of course, such a report must be provided to the defendant in a timely manner.

---

11. Having found a confrontation error in this case resulting from a substitute medical examiner testifying as to the contents of a non-testifying medical examiner's report, we believe it would be better practice in future cases for a substitute

Steve Carson—OCPD, 701 Colcord, Oklahoma City, Oklahoma 73102

Homicide Detective assigned to case. Will testify consistently with reports previously provided and preliminary hearing testimony. Will sponsor consent to search 807 S.W. 47th obtained from Katya Chacon. Will sponsor video taped confession of defendant. Worked the crime scene at 807 S.W. 47th.

(O.R.547). There is no merit to this claim.

### 7.

### Sufficiency of Evidence: First Degree Murder

¶ 49 Cuesta–Rodriguez claims that there was insufficient evidence to support his conviction for first degree murder. In particular Cuesta–Rodriguez contends that the evidence of his intent to murder Fisher was insufficient to overcome evidence that he was intoxicated and therefore unable to form the specific intent to kill (i.e., malice aforethought). When considering a sufficiency of the evidence claim, we review the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–04 (citing *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560, 571 (1979)).

¶ 50 Katya Chacon saw Cuesta–Rodriguez shoot Fisher on the right side of her face and Cuesta–Rodriguez admitted to police that he shot Fisher. Cuesta–Rodriguez was the only person in the house with Fisher when police heard her screams stop with a second gunshot. Testimony from Gordon Robertson, a firearms examiner for the Oklahoma State Bureau of Investigation, showed that the handgun Cuesta–Rodriguez used was unusual in that it required several sequential steps to be fired a second time. Additionally, after he shot Fisher the second time, Cuesta–Rodriguez remained barricaded in the house, even though there were police and emergency medical personnel just outside that could have provided assistance.

¶ 51 When this evidence is considered in the light most favorable to the State, it was sufficient to permit a rational trier of fact to conclude that Cuesta–Rodriguez intended to kill Fisher with either the first or second gunshots despite some evidence showing that he was intoxicated, but not so intoxicated that his mental powers were overcome rendering him incapable of forming criminal intent.

### 8.

### Jury Selection: Manner and Extent of Voir Dire

¶ 52 Cuesta–Rodriguez claims that the jury selection method used by the trial judge did not provide him with an adequate opportunity to meaningfully question potential jurors on their ability to follow the law in determining a sentence for first degree murder. Cuesta–Rodriguez complains specifically that the trial court judge did not permit individual questioning of jurors but allowed only en masse questioning of the group with yes-no questions. According to Cuesta–Rodriguez this was a superficial mode of examining jurors that provided little information about individual jurors and thereby denied him the opportunity to exercise his peremptory challenges intelligently. Cuesta–Rodriguez also complains that placing thirty potential jurors in the courtroom for voir dire examination, created uncomfortable conditions for the jurors and an atmosphere not conducive to discovering bias, interest, or partiality.

¶ 53 The manner and extent of voir dire is within the discretion of the trial court and the trial court's voir dire rulings will not be disturbed on appeal unless the court's decision was clearly erroneous or manifestly unreasonable. *Hogan v. State*, 2006 OK CR 19, ¶ 13, 139 P.3d 907, 917, *reh'g granted*, 2006 OK CR 27, 139 P.3d 907. There is no abuse of discretion if the voir dire questioning is broad enough to afford the defendant a jury free of outside influence, bias or personal interest. *Id.*

¶ 54 Contrary to Cuesta–Rodriguez's claim, the transcript of the voir dire proceeding shows that while there were twenty-eight

potential jurors seated in the courtroom, defense counsel questioned many of them individually and elicited more than yes or no answers from them. Additionally, Cuesta–Rodriguez does not point to any instance in which he sought to ask a question of a particular juror but was prevented from doing so by the trial judge's voir dire method. Furthermore, Cuesta–Rodriguez does not allege that his jury was not impartial, nor does he point to any evidence the court's method of selection of a jury hindered his voir dire questioning or his intelligent exercise of peremptory challenges.

¶ 55 The trial court's method of conducting voir dire of a large group was neither clearly erroneous nor manifestly unreasonable because Cuesta–Rodriguez was able to question individual venire members broadly. The trial court did not abuse its discretion.

### 9.

### Jury Selection: Individual Questioning and Questionnaires

■ ¶ 56 Cuesta–Rodriguez claims the trial court judge erroneously denied his requests for individual sequestered voir dire of potential jurors and for use of jury questionnaires. Cuesta–Rodriguez argues that his inability to use questionnaires and conduct individual sequestered voir dire denied him the opportunity to question potential jurors individually and thereby deprived him of the ability to intelligently exercise his peremptory challenges to strike biased jurors.

■■ ¶ 57 Individual voir dire may be held at the discretion of the trial court. *McCarty v. State,* 1995 OK CR 48, ¶ 5, 904 P.2d 110, 115. Individual voir dire is appropriate where the record shows jurors were not candid in their responses about the death penalty, or that responses were tailored to avoid jury service. *Stouffer v. State,* 2006 OK CR 46, ¶ 12, 147 P.3d 245, 257. Cuesta–Rodriguez does not allege that jurors were not candid in their responses or that any juror provided responses tailored to avoid jury service. He argues only that, had he been able to question sequestered jurors individually, he could have probed more deeply in trying to find juror bias. In the absence of some evidence on the record that jurors were not candid in their responses or were attempting to avoid jury service, individual sequestered voir dire was not warranted.

■ ¶ 58 Because of the difficulty in evaluating juror candor from a transcript, this Court places great weight on the trial court's opinion of the jurors. *Childress v. State,* 2000 OK CR 10, ¶ 41, 1 P.3d 1006, 1015. Additionally, while this Court has encouraged trial courts to use jury questionnaires in capital cases, we have never held that their use is mandatory in every instance. *Jones v. State,* 2006 OK CR 17, ¶ 16, 134 P.3d 150, 156. Thus, the use of questionnaires, like individual voir dire, is also discretionary with the trial court. *See Jones,* 2006 OK CR 17, ¶ 3, 134 P.3d at 160 (A. Johnson, J. concurring); Instruction Number 1–10, OUJI–CR(2d) (Supp.2009)(Notes on Use)("[i]n its discretion, the trial court may direct use of this juror questionnaire ... as a supplement to, rather than a substitute for voir dire"). In this instance, the trial court, saw the prospective jurors, heard their responses firsthand, and found no need to conduct individual voir dire. Furthermore, Cuesta–Rodriguez does not identify any specific question he would have asked on a questionnaire that he did not ask, or could not have asked, during oral voir dire, to obtain information with which to raise a challenge for cause or to intelligently exercise a peremptory challenge. The trial court did not abuse its discretion by not incorporating juror questionnaires into the voir dire process and Cuesta–Rodriguez's constitutional right to due process was not harmed.

### 10.

### Jury Instructions

### A. Evidence Spoliation

■■ ¶ 59 Cuesta–Rodriguez claims his constitutional right to a fair trial was violated when the trial court refused to give his proffered jury instruction concerning the State's alleged failure to collect and preserve certain evidence. He argues that the trial court should have instructed jurors that they could draw a negative inference from the failure of police to collect and preserve liquor bottles

and a note written by Cuesta–Rodriguez from the crime scene.[12] We review a trial court's rulings on jury instructions for an abuse of discretion. *Eizember v. State*, 2007 OK CR 29, ¶ 111, 164 P.3d 208, 236.

¶ 60 While the actual liquor bottles were not collected and preserved as evidence, the fact of the presence of liquor bottles at the scene was established by photographs of the bottles taken by the police. It is not obvious to us why the bottles themselves would have been any more exculpatory than the photographs of the bottles that were entered into evidence. The handwritten note was last seen in Cuesta–Rodriguez's possession when Katya Chacon fled the house after reading it. Detective Carson testified that officers did not find the note when they searched the house and stated further that if they had, they certainly would have collected it and preserved it for trial. Despite this, the substance of the note was disclosed to the jury when Katya Chacon testified as to what it said. Again, it is not obvious to us why the note itself would have been any more exculpatory than Katya Chacon's testimony about what it said. Under these circumstances, we see no evidence that the failure of police to collect liquor bottles and a note from the scene constituted bad faith conduct. Nor are

we convinced that Cuesta–Rodriguez was prejudiced in some way by the evidence of these items that was collected and introduced.

¶ 61 In the absence of a showing of bad faith by police, therefore, an instruction allowing the jury to draw a negative inference from the destruction of evidence was not appropriate. *See Torres v. State*, 1998 OK CR 40, ¶ 24, 962 P.2d 3, 13 (holding that unless defendant can show bad faith by police, destruction of potentially useful evidence does not constitute due process violation and instruction allowing jury to draw negative inference from destruction of evidence is not warranted). The trial court did not abuse its discretion by denying Cuesta–Rodriguez's request for a negative inference instruction.

## B. Reasonable Doubt

¶ 62 Cuesta–Rodriguez also contends that his rights to due process were violated when the trial court refused his proffered jury instruction on reasonable doubt. We have consistently and repeatedly held that reasonable doubt is self-explanatory, and that rather than clarifying the meaning of the phrase, definitions of reasonable doubt tend to confuse the jury.[13] We decline to revisit this issue.

---

12. Cuesta–Rodriguez requested the following instruction:

> There has been evidence presented that the State in this case failed to preserve or collect evidence that existed at the home of Carlos Cuesta and Olimpia Fisher, specifically a note written by Carlos Cuesta to Olimpia Fisher and Katya Chacon that would have shown Defendant's state of mind just hours before Olimpia Fisher was killed and empty tequila bottles and a shot glass that would have corroborated testimony that Defendant was intoxicated at the time Olimpia Fisher was killed.
>
> The failure of the State to preserve this evidence creates a rebuttable presumption that the missing evidence has qualities or characteristics favorable to the Defendant and adverse to the State. This presumption could be sufficient to raise a reasonable doubt that Defendant was not intoxicated to the point he could not form the specific mental intent of malice aforethought.
> (O.R.1180).

13. *See Harris v. State*, 2004 OK CR 1, ¶ 51, 84 P.3d 731, 750 ("we have long disapproved of attempts by the trial court to define reasonable

doubt for the jury"); *Al–Mosawi v. State*, 1996 OK CR 59, ¶ 27, 929 P.2d 270, 279 ("[t]his Court has long and consistently condemned the giving of an instruction as to the definition of the term 'reasonable doubt' and held that the giving of same is error"); *Romano v. State*, 1995 OK CR 74, ¶ 55, 909 P.2d 92, 115 ("[i]t is error for any party to try to define 'beyond a reasonable doubt'"); *Smallwood v. State*, 1995 OK CR 60, ¶ 51, 907 P.2d 217, 231 ("[i]t is well settled that the term 'reasonable doubt' is self-explanatory and it is error for the trial court or prosecutor to attempt to define it for the jury"); *Cheatham v. State*, 1995 OK CR 32, ¶ 55, 900 P.2d 414, 428 ("it is well settled that the term 'reasonable doubt' is self-explanatory and is not to be defined in jury instructions"); *LaFevers v. State*, 1995 OK CR 26, ¶ 29, 897 P.2d 292, 305 (this Court has consistently held that 'reasonable doubt' is self-explanatory and any instruction on it is error); *Summers v. State*, 1985 OK CR 98, ¶ 2, 704 P.2d 91, 92 ("[i]t is error for the trial court or the prosecutor to attempt to define reasonable doubt to the jury"); *Underwood v. State*, 1983 OK CR 28, ¶ 9, 659 P.2d 948, 950 ("'reasonable doubt' is self-explanatory, and ... definitions thereof do not clarify the meaning of the phrase, but rather

## 11.

### Prosecutor's Decision to Seek Death Penalty

 ¶ 63 Cuesta–Rodriguez claims that the prosecutor's decision to seek the death penalty was arbitrary and therefore his death sentence violates the Eighth Amendment prohibition against cruel and unusual punishment. Cuesta–Rodriguez argues that the arbitrariness of the prosecutor's decision is shown by the fact Oklahoma County prosecutors chose not to seek the death penalty in two unrelated first-degree murder cases tried in 2001 and 2007. According to Cuesta–Rodriguez, the two instances he cites show that Oklahoma applies the death penalty in a "freakish and wanton manner" that does not comport with the constitutional mandate of consistent even handed application set out in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

 ¶ 64 "The decision regarding which criminal charge to bring lies within the wide parameters of prosecutorial discretion." *Childress*, 2000 OK CR 10, ¶ 18, 1 P.3d at 1011. *See also Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978) (holding that as long as prosecutor has probable cause to believe that accused committed an offense defined by statute, decision whether or not to prosecute, and what charge to file "generally rests entirely in his discretion"). Prosecutorial discretion is not unlimited, however, but is cabined only by the constitutional requirement that its exercise not be based on some arbitrary classification such as race or religion. *See Bordenkircher*, 434 U.S. at 364, 98 S.Ct. at 668–69 (" '[t]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation' so long as 'the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification' ")(quoting *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962)). To prevail on a claim of an abuse of prosecutorial discretion, therefore, it is the defendant's burden to show that his prosecution is based on some impermissible discriminatory ground. *Childress*, 2000 OK CR 10, ¶ 18, 1 P.3d at 1011.

¶ 65 In this instance, even assuming that Cuesta–Rodriguez's case was identical to the cases of the two defendants he cites, he fails to allege that the prosecutor's decision to seek the death penalty in his case, was motivated by some impermissible classification such as race or religion.[14] Absent such a showing, and considering the facts alleged by Cuesta–Rodriguez, we can conclude only that the prosecutor chose to exercise some selectivity when electing to seek the death penalty in Cuesta–Rodriguez's case. We cannot conclude that his exercise of discretion rose to the level of a constitutional violation.

## 12.

### Victim Impact Testimony

### A. Focus on Emotional and Psychological Impact

 ¶ 66 Cuesta–Rodriguez claims the trial court erred in admitting certain victim

---

tend to confuse the jury"); *Taylor v. State*, 1983 OK CR 24, ¶ 4, 659 P.2d 362, 364 ("[t]he phrase 'reasonable doubt' is self-explanatory and definitions of it do not clarify its meaning but tend to confuse the jury"); *Pannell v. State*, 1982 OK CR 13, ¶ 3, 640 P.2d 568, 570 ("An attempt to define 'reasonable doubt' by a trial judge is reversible error. The phrase 'reasonable doubt' is self-explanatory; definitions do not clarify its meaning, but rather tend to confuse the jury").

**14.** Cuesta–Rodriguez calls our attention to the 2001 case of *State v. Hamilton*, Okla. Co. No. CF–01–1147, and the 2007 case of *State v. Vargas*, Okla. Co. No. CF–06–7890, and alleges that these were first degree murder cases in which the prosecutor did not seek the death penalty. Whatever the significance of these two cases, a cursory review of our published opinions shows that Oklahoma County prosecutors sought the death penalty in at least sixteen first degree murder cases during the same time period. *See Simpson v. State*, 2010 OK CR 6, 230 P.3d 888, *Hunt v. State*, 2009 OK CR 21, 218 P.3d 516, *Jones v. State*, 2009 OK CR 1, 201 P.3d 869, *Grant v. State*, 2009 OK CR 11, 205 P.3d 1, *Littlejohn v. State*, 2008 OK CR 12, 181 P.3d 736, *Andrew v. State*, 2007 OK CR 23, 164 P.3d 176, *Pavatt v. State*, 2007 OK CR 19, 159 P.3d 272, *Wood v. State*, 2007 OK CR 17, 158 P.3d 467, *Smith v. State*, 2007 OK CR 16, 157 P.3d 1155, *Glossip v. State*, 2007 OK CR 12, 157 P.3d 143, *Hancock v. State*, 2007 OK CR 9, 155 P.3d 796, *Stouffer v. State*, 2006 OK CR 46, 147 P.3d 245, *Coddington v. State*, 2006 OK CR 34, 142 P.3d 437, *Hogan v. State*, 2006 OK CR 19, 139 P.3d 907, *Dodd v. State*, 2004 OK CR 31, 100 P.3d 1017, *Harris v. State*, 2004 OK CR 1, 84 P.3d 731.

impact evidence because the evidence was more prejudicial than probative. Cuesta–Rodriguez contends that the victim-impact testimony of Olimpia Fisher's daughters Katya and Cinthia Chacon focused exclusively on the emotional and psychological impact of the loss of their mother and was therefore too emotionally charged to be admissible.

¶ 67 Katya testified that she had nightmares about Cuesta–Rodriguez "abusing, hitting, stabbing, shooting, torturing her, and attempting to kill her mother again in [her] presence showing no guilt or remorse" (Tr. Vol.5, 967). She also described what her mother looked like after the shooting, which was cumulative to her testimony in the first stage. Katya testified further about the difficulty of having to tell her children, who never knew Fisher, that their grandmother was gone. Cinthia's testimony included information about the impact the crime had on her sister Katya as well as her own infant daughter. Both Katya and Cinthia testified about the difficulty of facing holidays, pregnancy and motherhood without their mother.

¶ 68 Evidence about the victim, the physical effects of the crime on the victim, the circumstances surrounding the crime, the manner in which the crime was perpetrated, and about the financial, emotional, psychological, and physical impact of the murder on the victim's family is admissible. 22 O.S. 2001, § 984; 21 O.S.2001, § 701.10(C). The testimony in this case clearly related to the physical effects of the crime, the manner in which it was carried out, and the emotional and psychological impact of Fisher's murder on her family. It was properly admitted as victim impact evidence.

¶ 69 Nevertheless, Cuesta–Rodriguez argues that his case is like *Cargle v. State*, 1995 OK CR 77, 909 P.2d 806, in which this Court found error in the admission of certain victim impact evidence that on its face met the statutory requirements for admissibility but was otherwise unfairly prejudicial when compared to its probative value. In *Cargle*, the victim impact evidence included extended testimony by the sister of one of the victims that recounted detailed anecdotes from the victim's childhood and college years through his death at age thirty-three. In addition to her own remembrances of the victim, the sister's testimony included second-hand reminiscences of friends of the victim. Acknowledging that information about a victim is permissible as victim impact evidence under 22 O.S. § 984, the *Cargle* court nevertheless explained that even victim impact evidence is subject to the balancing requirement of 12 O.S. § 2403, which mandates that evidence be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *Cargle*, 1995 OK CR 77, ¶¶ 80–81, 909 P.2d at 829–30. To ensure that victim impact evidence meets this test, the *Cargle* court explained that testimony about the personal characteristics of a victim should constitute a "quick glimpse" of the victim and the use of the evidence should be limited to showing how the victim's death is affecting or might affect the victim's survivors. *Id.* ¶ 75, 828.

¶ 70 Unlike the wide-ranging victim impact evidence condemned in *Cargle*, the testimony in this case, as Cuesta–Rodriguez concedes, "focused exclusively on the emotional and psychological impact of the crime" (Aplt's Brief at 62). Because the evidence was concise and narrowly focused on these permissible subjects, it was not unfairly prejudicial. The trial court did not abuse its discretion by allowing this victim impact testimony into evidence.

**B. Victim Impact Evidence as Superaggravator**

¶ 71 Cuesta–Rodriguez claims that victim impact evidence is not relevant to proving either the aggravating or mitigating factors necessary to perform the narrowing function for application of the death penalty. According to Cuesta–Rodriguez, victim impact evidence acts instead as a superaggravator and skews the sentencing proceeding in violation of the Eighth Amendment. We have rejected this argument in the past and are not persuaded to revisit the issue here. *See Hogan v. State*, 2006 OK CR 27, ¶ 71, 139 P.3d 907, 932; *Thacker v. State*, 2005 OK CR 18, ¶ 16, 120 P.3d 1193, 1196; *Harris v. State*, 2004 OK CR 1, ¶ 58, 84 P.3d 731, 752; *Murphy v. State*, 2002 OK CR 24, ¶¶ 45–47, 47 P.3d 876, 886.

## C. Victim Impact Evidence Jury Instruction

 ¶ 72 Cuesta–Rodriguez claims that the jury was improperly instructed as to the scope of victim impact evidence. Specifically, Cuesta–Rodriguez complains that Instruction No. 9–45, OUJI–CR(2d), which the trial court gave as Instruction No. 11 of the second stage jury instructions, contained language permitting jurors to consider that the victim was an "individual whose death may represent a unique loss to society and the family." Cuesta–Rodriguez argues that the phrase "unique loss to society" improperly allowed jurors to consider the impact of the loss of the victim on society at large rather than simply the impact on the immediate family.

¶ 73 Cuesta–Rodriguez did not object to this language at trial, and in fact, included it in his own proposed jury instruction. For that reason, this claim is waived as invited error. *See Ellis v. State,* 1992 OK CR 45, ¶ 28, 867 P.2d 1289, 1299 (holding that error invited by defense counsel cannot serve as basis for reversal because defendant cannot invite error and then seek to profit from it); *Pierce v. State,* 1990 OK CR 7, ¶ 10, 786 P.2d 1255, 1259 ("[w]e have often recognized the well established principal [sic] that a defendant may not complain of error which he has invited, and that reversal cannot be predicated on such error").

 ¶ 74 Nevertheless, the claim also fails on the merits. While Cuesta–Rodriguez is correct that 22 O.S.2001, § 984 does not specifically authorize victim impact evidence concerning the victim's "unique loss to society," he is incorrect in his assertion that the phrase exceeds the scope of victim impact testimony permitted by case law. Specifically, in *Cargle,* 1995 OK CR 77, ¶ 69, 909 P.2d at 826, this Court held that "victim impact evidence is permissible because 'the State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a *unique loss to society* and in particular to his family' "(emphasis added)(quoting *Payne v. Tennessee,* 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991)). The trial court did not err by using Instruction No. 9–45, OUJI–CR(2d) (Supp.2000), and its language referring to the "unique loss to society" resulting from a victim's death.

### 13.

### Continuing Threat: Sufficiency of Evidence

 ¶ 75 Cuesta–Rodriguez claims the evidence was insufficient to support the jury's finding of the continuing threat aggravating circumstance. We review a challenge to the sufficiency of the evidence of an aggravating circumstance in the light most favorable to the State to determine whether any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt. *Jackson v. State,* 2007 OK CR 24, ¶ 29, 163 P.3d 596, 604.

 ¶ 76 To support this aggravating circumstance, the State must show that a defendant will continue to present a threat to society after sentencing. *Cudjo v. State,* 1996 OK CR 43, ¶ 30, 925 P.2d 895, 902. "A defendant's criminal history, the callousness of the crime, threats against others, lack of remorse, and attempts to prevent calls to the police are all factors" that can support a finding of continuing threat. *Id.* The record contains evidence of several of these factors:

(a) Criminal History: A California conviction for possession of heroin for sale; arrest for driving under the influence.

(b) Threats and Violence Against Others: A previous girlfriend obtained a victim protective order against Cuesta–Rodriguez because he had been drinking, angry, and violent; domestic abuse against Olimpia Fisher by Cuesta–Rodriguez in the weeks before the murder that left bruises on her abdomen and arm.

(c) Preventing Calls to Police: As Fisher attempted to call police for help on the night of her death, Cuesta–Rodriguez snatched the telephone from her hands, threw it against the window, and shot her.

(d) Callousness of the Crime: Cuesta–Rodriguez delivered the first gunshot to the right side of Fisher's face as her pregnant eighteen-year-old daughter watched in horror. Then, rather than seeking help, Cuesta–Rodriguez carried Fisher to his bed in another room and several minutes later, after Fisher struggled with him and tried to escape, shot her in the face a second time, all the while ignoring her desperate screams. Furthermore, despite the presence of police officers outside the house who could have assisted Fisher before or after the second gunshot, Cuesta–Rodriguez kept them locked out of the house for another three hours.

In its totality, this evidence is sufficient to support the jury's finding of the continuing threat aggravating factor.

### 14.

### Heinous, Atrocious, Cruel: Sufficiency of Evidence

 ¶ 77 Cuesta–Rodriguez claims the evidence was insufficient to support the jury's finding that this murder was heinous, atrocious, or cruel. Again, we review a challenge to the sufficiency of the evidence of an aggravating circumstance in the light most favorable to the State to determine whether any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt. *Jackson*, 2007 OK CR 24, ¶ 29, 163 P.3d at 604.

 ¶ 78 To establish that the murder was heinous, atrocious, or cruel, the State must prove: (1) that the murder was preceded by either torture of the victim or serious physical abuse; and (2) that the facts and circumstances of the case establish that the murder was heinous, atrocious, or cruel. *De-Rosa v. State*, 2004 OK CR 19, ¶ 96, 89 P.3d 1124, 1156. The "term 'torture' means the infliction of either great physical anguish or extreme mental cruelty." *Id.* A finding of "serious physical abuse" or "great physical anguish" requires that the victim have experienced conscious physical suffering prior to her death. *Id.* "[T]he term 'heinous' means extremely wicked or shockingly evil; the

term 'atrocious' means outrageously wicked and vile; and the term 'cruel' means pitiless, designed to inflict a high degree of pain, or utter indifference to or enjoyment of the suffering of others." *Id.*

¶ 79 When Cuesta–Rodriguez fired the first .410 shotgun cartridge from his pistol into Olimpia Fisher's eye, she was not rendered unconscious and continued to struggle. At one point during that struggle, Fisher screamed and banged on a barred bedroom window in an apparent attempt to escape. Her screams and banging were loud enough for police officers to hear through the closed doors and windows. The time between the first shot to her right eye, and the final fatal shot to the left eye was at least seven minutes. During this time, Fisher must have consciously experienced great physical and mental suffering. Additionally, the facts that Cuesta–Rodriguez fired the first shot in the presence of Fisher's daughter, targeted Fisher's eyes, ignored her screams after shooting her, and allowed her to linger for at least seven minutes show that the crime was pitiless. That is, the evidence allowed a reasonable inference that Cuesta–Rodriguez intended to inflict a high degree of pain and did so with utter indifference to Fisher's suffering. There was sufficient evidence for the jury to find this aggravating factor beyond a reasonable doubt.

### 15.

### Heinous Atrocious Cruel Aggravator Unconstitutional as Overbroad

 ¶ 80 Cuesta–Rodriguez claims that the heinous, atrocious, or cruel aggravating circumstance is unconstitutionally vague and overbroad on its face, and as applied to him. We have consistently rejected such claims in other cases and see nothing to convince us to change course here. *See Thacker v. State*, 2004 OK CR 32, ¶ 26, 100 P.3d 1052, 1058 (collecting cases). Nor do we find the heinous, atrocious, or cruel aggravator vague or overbroad as applied to Cuesta–Rodriguez because the aggravator does not require a showing that the injuries Cuesta–Rodriguez inflicted on the victim were the result of gratuitous violence. *See Mitchell v. State*,

2006 OK CR 20, ¶ 104, 136 P.3d 671, 711 ("we have recently addressed the argument that this aggravator is 'overbroad as applied' and explained that an aggravating circumstance does not become 'overbroad' based upon the manner it is applied to particular cases"); *DeRosa*, 2004 OK CR 19, ¶¶ 92–93, 89 P.3d at 1154–55 (rejecting argument that heinous, atrocious, cruel aggravator should be restricted to cases involving infliction of gratuitous violence).

██ ¶ 81 Cuesta–Rodriguez also claims that the heinous, atrocious, or cruel aggravator was rendered invalid by Dr. Gofton's testimony about Olimpia Fisher's manner of death. Specifically, Cuesta–Rodriguez argues that Dr. Gofton's testimony created the impression that Fisher's manner of death could have been slower than that described by Dr. Jordan in his autopsy report. According to Cuesta–Rodriguez, because Dr. Gofton's testimony about Dr. Jordan's autopsy report was improperly admitted, his conclusion as to the length of time Fisher consciously experienced suffering lacked any foundation. Assuming that Dr. Gofton's testimony as to the length of time Fisher may have remained conscious after the second gunshot to her face was improperly admitted, the error was harmless. Regardless of the length of time Fisher may have remained conscious after the second gunshot, other evidence, independent of Dr. Gofton's testimony, showed that Fisher experienced conscious physical suffering prior to her death.

¶ 82 Specifically, police officers testified that Fisher was alive and conscious when they arrived on scene several minutes after being summoned by Fisher's daughter because they could hear Fisher screaming and banging on a bedroom window trying to escape. Understanding that Fisher had been shot in the face several minutes before the police arrived, and having seen photographs of Fisher's face showing the blasted out right eye socket, jurors could reasonably conclude, independent of any testimony by Dr. Gofton, that in the several minutes before the fatal gunshot, Fisher experienced conscious physical suffering. Any error in the admission of Dr. Gofton's testimony as to the length of time Fisher may have consciously suffered after the second gunshot is therefore harmless beyond a reasonable doubt.

## 16.

### Limitation on Mitigating Evidence

██ ¶ 83 Cuesta–Rodriguez claims that his due process and Eighth Amendment rights to present mitigating evidence were violated when the judge presiding over pretrial motions issued a ruling limiting the testimony of Dr. Hamm, an expert on Cuba. Dr. Hamm had studied the conditions surrounding the Mariel Boatlift and the conditions in the facilities where certain Cubans such as Cuesta–Rodriguez were held while the United States and Cuba attempted to reach an agreement on what to do with them. Defense counsel represented that Dr. Hamm would provide specific testimony about conditions in Cuba for Cuesta–Rodriguez and his family as well as the conditions of Cuesta–Rodriguez's confinement in federal custody while awaiting a determination of his status. Counsel asserted that Dr. Hamm's testimony was essential to the jury understanding the cultural and historic background of Cuesta–Rodriguez's mitigation case. The trial court judge ruled that Dr. Hamm could testify about general matters related to the boatlift and detention of Cuban nationals, but he could not testify as to the specifics of Rodriguez's case or testify as to hearsay statements made by Cuesta–Rodriguez's mother or other relatives.

¶ 84 At trial, Dr. Hamm testified at length about the Mariel Boatlift, the circumstances that caused it, and the conditions of confinement in the United States of the relatively small numbers of Cubans that were incarcerated. Dr. Hamm also testified about the causes and history of prison riots involving incarcerated Marielitos. Cuesta–Rodriguez's counsel did not attempt to elicit testimony from Dr. Hamm about any specifics of Cuesta–Rodriguez's migration via Mariel or Cuesta–Rodriguez's activities while incarcerated, and counsel did not object for being constrained against doing so by the previous judge's pretrial ruling. At one point during Dr. Hamm's testimony, the prosecutor objected to the testimony's relevance to Cues-

ta–Rodriguez, and the judge's response, directed to Cuesta–Rodriguez's counsel, was merely to "cut to the chase."

¶ 85 Cuesta–Rodriguez now claims that the pretrial ruling on the State's motion in limine was incorrect and that the trial court judge's sustaining of the prosecutor's objection to Dr. Hamm's testimony that was given at trial in accordance with the pretrial ruling was also incorrect. Cuesta–Rodriguez contends that the combined effect of both of these rulings denied him the opportunity to present evidence in mitigation of the death penalty. Specifically, Cuesta–Rodriguez argues that he was denied the opportunity through Dr. Hamm's testimony to provide the jury with the cultural and historic context of Cuesta–Rodriguez's mitigation case.

¶ 86 There are several problems with this argument. First, Cuesta–Rodriguez did not raise the previous judge's pretrial ruling again at trial, nor did he proffer to the trial judge what testimony he wanted to present beyond that authorized by the pretrial ruling. "A ruling on a motion in limine is advisory and not conclusive." *Kaiser v. State*, 1983 OK CR 156, ¶ 5, 673 P.2d 160, 161. An incorrect ruling on a pretrial motion is not grounds for reversal. After a motion in limine is sustained, the party seeking to introduce the evidence must make an offer of proof at trial. *Id.* ¶ 6, 162. This affords the trial court an opportunity to make a final ruling on the evidence. *Id.* "Failure to follow the proper procedure contesting a ruling on a motion in limine waives the issue for appellate review." *Id.* This issue was not properly preserved for appellate review. It is waived.

¶ 87 Second, the claim fails in substance. As he did below, Cuesta–Rodriguez fails to identify here, just what testimony he was precluded from presenting by the pretrial ruling on the State's motion in limine. The trial record shows that Dr. Hamm testified at great length about the Mariel Boatlift of 1980 and the political, social, and economic circumstances that gave rise to it. He also testified about the numbers of Cubans that entered the United States via the Mariel Boatlift (Marielitos), the numbers that were released into the United States, and the numbers and reasons that some of the Marielitos were detained in federal prisons. Dr. Hamm also testified as to the conditions under which the detained Marielitos were incarcerated, to include the conditions that gave rise to the Marielito prison riots in the two federal prisons that housed them in 1987. Dr. Hamm explained further that as a result of the negotiated end of the prison disturbances, the federal government agreed to provide a "meaningful review" for release or deportation to Cuba for all incarcerated Marielitos. He also explained the review process and how someone like Cuesta–Rodriguez would have been affected by long-term indefinite incarceration and how he would have been processed for release under the federal government's "meaningful review procedures." This testimony provided the jury with cultural and historical context concerning the Mariel Boatlift, the Marielito detainees, and by implication, Cuesta–Rodriguez's background as a Marielito.

¶ 88 Additionally, Cuesta–Rodriguez's claim that the trial court erroneously sustained the State's relevance objection during the course of Dr. Hamm's testimony also fails when considered on the merits. At one point, when defense counsel asked Dr. Hamm to compare the Marielito prison riots to riots in other American prisons involving American prisoners, the prosecutor objected on grounds of relevance. In response to the objection, and after some discussion at the bench, the trial court judge sustained the objection and told defense counsel to "cut to the chase" (Tr. Vol.6, 1144). We agree with the trial court and fail to see how a comparison of the Marielito prison riot in the Atlanta federal prison with other American historic prison riots, would have been relevant as to Cuesta–Rodriguez's degree of blameworthiness in the murder of Olimpia Fisher. Further, in light of Dr. Hamm's extensive testimony about the course of the Marielito prison riots and his testimony about the Mariel Boatlift and the treatment of the Marielitos in the United States, we fail to see how the trial court's sustaining of this objection prejudiced Cuesta–Rodriguez's ability to provide the jury with cultural and historical

context concerning Cuesta–Rodriguez's background as a Marielito.

## 17.

### Misleading Mitigating Evidence Jury Instruction

■ ¶ 89 Cuesta–Rodriguez claims that the jury instruction defining mitigation in his case contradicted the instruction that listed specific mitigating circumstances the jury should consider. According to Cuesta–Rodriguez, this alleged contradiction rendered the sentencing proceeding unreliable.

¶ 90 During the penalty phase, the jury was given an instruction that defined mitigating circumstances as follows:

Mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame. The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case.

(O.R. Vol. 7, 1284 (Instruction No. 9)). This instruction was a nearly verbatim version of Instruction No. 4–78, OUJI–CR(2d) (Supp. 2007). The Jury was also instructed that:

Evidence has been introduced as to the following mitigating circumstances:

1. Carlos Cuesta came to the United States from the poverty-stricken Communist country of Cuba.

2. Carlos Cuesta came to the United States with 120 thousand other Cubans during the Mariel Boat Lift of 1980.

3. Carlos Cuesta was taken into Federal detention in 1983 after he was convicted of possession of heroin for sale and sentenced to one year in jail and four years probation.

4. During his time in Federal custody, some Cubans in the prison who feared repatriation revolted. Carlos Cuesta volunteered for and welcomed repatriation so that he would see his family again.

5. During his Federal Detention, Cuesta used his time productively to learn to speak and read English.

6. Carlos Cuesta has a long, stable work history with Forest Lumber and Dan Fioroni, Chairman of the Board. From 1992 until 2002 he was a respected, valued employee of Forest Lumber. And after his departure from Forest Lumber, he remained a cherished and trusted friend of Mr. Fioroni's, even continuing to work at Mr. Fioroni's personal residence until the time of his arrest. Carlos Cuesta has the friendship and support of Dan Fioroni now and in the future.

7. For seven years Carlos Cuesta volunteered his time and skills in the Christmas in April project, where the homes of elderly and needy persons were made safe and habitable.

8. Carlos Cuesta's past employment experiences and willingness to work will make his an asset to a prison community where productive inmate workers are needed.

9. Carlos Cuesta has family in Cuba that he has maintained regular contact with throughout the years, through letters and telephone calls. These family members appeared through depositions and/or videotape and asked you to spare Carlos Cuesta's life.

10. Carlos Cuesta loves his son, Carlos (Kery) Cuesta Gonzalez, and despite time and distance, has had a positive influence on him. Carlos (Kery) Cuesta Gonzalez is studying to become a writer because of the beautiful letters his father wrote to the family over the years.

11. After entering into a relationship with Olimpia Fisher, Carlos Cuesta began to suffer from serious, debilitating depression. This condition was made worse by self medication with alcohol and other substances.

12. Carlos Cuesta's mental condition rapidly deteriorated such that it was obvious to those around him. This deteriorated mental condition, combined with alcohol and other substances, culminated in Carlos Cuesta's actions on May 31, 2003 which caused the death of Olimpia Fisher.

13. For the past 4 years Carlos Cuesta's mental condition has been effectively stabilized by medications that are given to him in the county jail. These medications ease the symptoms of depression and delusions.

14. While housed in the County Jail, Carlos Cuesta was identified by jail medical staff as being a candidate for the WRAP Program, a Department of Mental Health program, in which Carlos Cuesta actively participated and successfully completed.

15. Carlos Cuesta has behaved well in the Oklahoma County Jail the past 4 years while he has been awaiting trial.

16. Carlos Cuesta is remorseful for causing the death of Olimpia Fisher.

In addition, you may decide that other mitigating circumstances exist, and if so, you should consider those circumstances as well.

(O.R. Vol. 7, 1287–1288 (Instruction No. 10)). With the exception of the specific circumstances enumerated, this instruction was taken directly from Instruction No. 4–79, OUJI–CR(2d) (Supp.2007).

¶ 91 Cuesta–Rodriguez argues that these instructions, as given, were confusing to the jury and therefore could have led to an erroneous application of the death penalty because when read together, the mitigating circumstances listed in Instruction 10 do not fit within the definition of mitigating circumstances given in Instruction 9. We do not see any contradiction. For example, the fact that Cuesta–Rodriguez was remorseful, or the fact that he volunteered to help the elderly and needy are things which, in fairness, sympathy, or mercy, could extenuate or reduce the degree of moral culpability or blame because they are evidence of good character.[15]

¶ 92 Cuesta–Rodriguez argues further, however, that jurors likely understood these instructions when combined with the prosecutor's closing argument as foreclosing them from considering the proffered mitigating evidence because it did not tend to reduce his moral culpability or blame for the crime for which he had been convicted.

¶ 93 We rejected a nearly identical argument in *Harris v. State*, 2007 OK CR 28, ¶ 25, 164 P.3d 1103, 1113, and do the same here. As we did in *Harris*, we do not read Instruction No. 9 (based on Instruction No. 4–78, OUJI–CR(2d)) (Supp.2007) as foreclosing consideration of the mitigating circumstances cited in Instruction No. 10 (based on Instruction No. 4–79, OUJI–CR(2d) (Supp. 2007)).[16] The jury was properly instructed.

**15.** The version of the Oklahoma Uniform Jury Instructions in effect at the time of Cuesta–Rodriguez's trial listed evidence of the defendant's character as an illustrative example of a type of permissible mitigating circumstance. *See* Instruction No. 4–79, OUJI–CR(2d) (Supp.2007). The complete list of OUJI 4–79's illustrative examples includes the following:
 (1) the defendant did not have any significant history of prior criminal activity;
 (2) the defendant acted under duress or under the domination of another person;
 (3) the defendant's capacity to appreciate the criminality of his/her conduct or to conform his/her conduct to the requirements of law was impaired;
 (4) the defendant was under the influence of mental/emotional disturbance;
 (5) the victim was a willing participant in the defendant's conduct;
 (6) the defendant acted under circumstances which tended to justify, excuse or reduce the crime;
 (7) the defendant is likely to be rehabilitated;
 (8) cooperation by the defendant with authorities;
 (9) the defendant's age;
 (10) the defendant's character;
 (11) the defendant's emotional/family history.
The specific mitigating circumstances listed in the instruction that was actually given to Cuesta–Rodriguez's jury easily fall into these categories (see main text).

**16.** Expressing concern about potential misuse of the language of the instruction by prosecutors in closing argument, the *Harris* court directed that the language of Instruction No. 4–78, OUJI–CR(2d) be modified to include language stating "(a) that mitigating circumstances may extenuate or reduce the degree of moral conduct or blame, and separately, (b) that mitigating circumstances are those which in fairness, sympathy or mercy would lead jurors individually or collectively to decide against imposing the death penalty." *Harris*, 2007 OK CR 28, ¶ 27, 164 P.3d at 1114–15. *Harris* emphasized, however, that the language of the previous OUJI instruction (the one at issue here) was not legally inaccurate, inadequate, or unconstitutional and stated further that "cases in which the current OUJI–CR (2d) 4–78 has been used and applied are not subject to

¶ 94 Unlike *Harris,* however, where we found that a prosecutor argued improperly that jurors should not consider defendant Harris's evidence as mitigating because it did not extenuate or reduce his guilt or moral culpability, we find that the prosecutor's argument in this case was proper. Specifically, the prosecutor in this case did not urge the jury to categorically disregard the proffered mitigation evidence, but instead argued that the evidence offered in mitigation did not support an inference of reduced culpability. *See e.g.,* Tr. Vol. 7, 1284 ("And, again, I'm not telling you don't listen to them; by all means, you consider what they have to say. I'm telling you that ... it doesn't do anything to reduce the moral culpability of what he did to Olimpia Fisher"), 1313 ("So now let's look at the mitigating evidence they offer ... and you ask yourselves ... does that reduce his degree of culpability or blame? State submits no"). The prosecutor in this case properly argued the evidence and reasonable inferences to be drawn from it. *See e.g., Selsor v. State,* 2000 OK CR 9, ¶¶ 38–40, 2 P.3d 344, 354 (finding that prosecutor's argument constituted fair comment on defendant's mitigating evidence where argument was based on facts adduced at trial and reasonable inferences drawn from it).

### 18.

### Prosecutorial Misconduct

■■■ ¶ 95 Cuesta–Rodriguez claims that numerous instances of improper argument and questioning of witnesses during the sentencing phase of his trial produced a sentence that failed to meet the heightened standard of reliability in death penalty cases required by the Eighth Amendment. According to Cuesta–Rodriguez, the prosecutors asked questions designed to make the jury disregard the mitigating circumstances and did so in pursuit of a strategy of convincing jurors that the defense had not presented any mitigating evidence to weigh against the aggravators. With regard to closing argument, Cuesta–Rodriguez contends that the prosecutors made many statements designed to diminish, denigrate, or completely invali-

date the mitigating evidence that was presented.

■■■ ¶ 96 "Relief will be granted on a prosecutorial misconduct claim only where the misconduct effectively deprives the defendant of a fair trial or a fair and reliable sentencing proceeding." *Mitchell,* 2006 OK CR 20, ¶ 95, n. 208, 136 P.3d at 708, n. 208. We evaluate alleged prosecutorial misconduct within the context of the entire trial, considering not only the propriety of the prosecutor's actions, but also the strength of the evidence against the defendant and the corresponding arguments of defense counsel. *Hanson v. State,* 2009 OK CR 13, ¶ 18, 206 P.3d 1020, 1028; *see also Paxton v. State,* 1993 OK CR 59, ¶ 69, 867 P.2d 1309, 1329 (holding that alleged errors of prosecutorial misconduct should not, on an individual basis, serve as cause for reversal, but instead require reversal only if cumulative effect was such that they deprived defendant of fair trial).

¶ 97 We have reviewed the prosecutors' questions and comments cited by Cuesta–Rodriguez as improper. With one exception, we see nothing in any of those questions or comments, individually or cumulatively, that go beyond an attempt to minimize the effect of the evidence presented by the defense, or going beyond discussing the evidence in arguing for an appropriate sentence. *See Warner v. State,* 2006 OK CR 40, ¶ 192, 144 P.3d 838, 891 ("prosecutor may properly attempt to minimize the effect of the evidence presented by the defense"); *Bland v. State,* 2000 OK CR 11, ¶ 94, 4 P.3d 702, 727 (holding that prosecutor may discuss evidence during penalty phase and argue for appropriate punishment). Additionally, the jury was properly instructed as to mitigating evidence, and the prosecutors' questions and argument, while often pointed or skeptical, did not preclude the jury from considering all the mitigating evidence. *Warner,* 2006 OK CR 40, ¶ 192, 144 P.3d at 891; *see also Powell v. State,* 2000 OK CR 5, ¶ 139, 995 P.2d 510, 538 (finding no error where prosecutor made legal arguments as to why mitigating circum-

---

reversal on this basis." *Id.* ¶ 26, 1114. The jury rendered its sentencing verdict in this case on

June 12, 2007. *Harris* was decided on July 19, 2007.

stances listed in the jury instructions should not be considered as reducing blame because jury was not precluded from considering as mitigating factor, any aspect of defendant's character or record or any circumstances of offense that appellant proffered as basis for sentence less than death). Cuesta–Rodriguez was not denied a fair or reliable sentencing proceeding.

¶ 98 We do note, however, that in one instance, when referring to defense counsel's closing argument, the prosecutor told jurors that "what you've heard for 20 minutes is the guilt trip" (Tr. Vol.7, 1304). Defense counsel immediately objected and the judge admonished the prosecutor to rephrase the statement. On rephrasing the statement, the prosecutor told the jury:

> You know, when I say guilt trip, you don't need to feel guilty about doing your job. He's the one that brought us together. It is his actions. And I want to talk about that because you can consider sympathy absolutely.

(Tr. Vol.7, 1306). And shortly thereafter, he said:

> So, yeah, when they want to talk to you about mercy, which you can consider, and I submit to you you decide if you should feel guilty about doing your job ... [defense objection, overruled] ... So when they ask you about mercy, and I say, you don't have to feel guilty if you're sitting on this jury; you're doing your civic duty.

(Tr. Vol.7, 1310).

¶ 99 In *Hooker v. State,* 1994 OK CR 75, ¶ 55, 887 P.2d 1351, 1367, we specifically condemned the practice of referring to mitigation as a "guilt trip." Like the "guilt trip" argument in Hooker, the prosecutor's first "guilt trip" comment in this case pushes beyond the limits of permissible argument because it was not a comment on the evidence, but instead was an obvious attempt to denigrate Cuesta–Rodriguez's mitigation defense. The prosecutor's other two comments referring to "guilt trip" or feeling guilty both come very close to crossing this line. Nevertheless, we do not find that any of these comments were verdict determinative, and

given the strength of the evidence supporting imposition of the death penalty, they were harmless. *Id.* In any event, while we find the improper argument was harmless in this instance, we caution prosecutors in future cases to keep their argument focused on the evidence and to avoid making comments that do nothing but denigrate the defense.

### 19.

### Miscellany

¶ 100 In this section, Cuesta–Rodriguez raises eight claims, challenging various sentencing phase jury instructions, the constitutionality of Oklahoma's death penalty scheme, and the manner in which the death penalty is carried out.

■ ¶ 101 Cuesta–Rodriguez contends that the sentencing phase jury Instruction No. 6, as taken verbatim from Instruction No. 4–76, OUJI–CR(2d) (Supp.2000), seriously diminished the effect of the mitigating evidence. Cuesta–Rodriguez did not object to this instruction at trial, and in fact, as the State points out, his requested instruction contains the very language he now claims is defective. This claim is waived. *See Warner,* 2006 OK CR 40, ¶ 135, 144 P.3d at 881 (holding that failure to object to jury instruction waives all but plain error review); *Ellis,* 1992 OK CR 45, ¶ 28, 867 P.2d at 1299 (holding that invited error may not serve as basis for reversal). We find no plain error. *See Pickens v. State,* 1993 OK CR 15, ¶¶ 43–45, 850 P.2d 328, 339 (rejecting similar claim on the merits).

■ ¶ 102 Cuesta–Rodriguez argues that Instruction No. 6, taken verbatim from Instruction No. 4–76, OUJI–CR(2d) (Supp. 2000), erroneously implies that a life sentence is appropriate only if the jury failed to find the existence of an aggravating circumstance. Again, Cuesta–Rodriguez did not object to this instruction at trial, and again, in fact, he requested the very language he now claims is defective. This claim is waived. *See Warner,* 2006 OK CR 40, ¶ 135, 144 P.3d at 881; *Ellis,* 1992 OK CR 45, ¶ 28, 867 P.2d at 1299. We find no plain error.[17]

---

**17.** Even when considered on the merits, this

claim fails. Instruction No. 13 (O.R.7, 1292), is

¶ 103 Cuesta–Rodriguez claims that Instruction No. 13, taken directly from Instruction No. 4–80, OUJI–CR(2d) (Supp.1997), set out an improper burden of proof by failing to instruct jurors that the aggravating factors must outweigh the mitigating circumstances beyond a reasonable doubt in order to impose the death penalty. We have consistently rejected this claim in other cases. *Harris v. State,* 2004 OK CR 1, ¶ 66, 84 P.3d 731, 754–55; *Torres v. State,* 2002 OK CR 35, ¶ 7, 58 P.3d 214, 216. We are not persuaded to revisit the issue here.

■ ¶ 104 Cuesta–Rodriguez attacks the entire death penalty scheme for this State as unconstitutional for vagueness, overbreadth, abuse of prosecutorial discretion, and arbitrariness. Cuesta–Rodriguez's brief provides neither argument nor authority to support these sweeping allegations. Instead, he purports to "incorporate by reference" into his brief the arguments and authorities on these issues as they were raised in pretrial motions in the trial court (*See* Aplt's Brief at 93). Rule 3.5(A)(5), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2010), requires that an appellant's brief, among other things, must include:

An *argument,* containing the contentions of the appellant, which sets forth all assignments of error, *supported by citations to the authorities, statutes and parts of the record.* Each proposition of error shall be set out separately in the brief. Merely mentioning a possible issue in an argument or citation to authority does not constitute the raising of a proposition of error on appeal. *Failure to list an issue pursuant to these requirements constitutes waiver on appeal.* See Armstrong v. State,* 1991 OK CR 34, 811 P.2d 593, 599.

(Emphasis added). Rule 3.5(A)(5) is clear. This rule unambiguously directs that an appellant's argument and authority must be contained within the pages of his brief. Cuesta–Rodriguez's brief does not comply with the rule. The issue is waived.[18]

¶ 105 Cuesta–Rodriguez contends that the trial court erroneously denied his motion to strike Oklahoma's death penalty sentencing procedure as unconstitutional because it requires a jury to make special findings of fact prohibited by Okla. Const. art. VII, § 15. Cuesta–Rodriguez asks us to reconsider our prior decision on this issue as set out in *Duckett v. State,* 1995 OK CR 61, ¶ 91, 919 P.2d 7, 27, but provides no argument or authority to support his claim. This issue is waived. Rule 3.5(A)(5), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2010).

¶ 106 Cuesta–Rodriguez argues that the trial court erroneously denied his request for a jury instruction on the presumption of a life sentence. Again, Cuesta–Rodriguez provides no argument or authority to support his claim. The issue is waived. Rule 3.5(A)(5), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2010).

¶ 107 Cuesta–Rodriguez claims that the trial court erroneously denied his motion to allow him the right of allocution and to argue last but fails to provide any argument or authority to support this claim. The issue is waived. Rule 3.5(A)(5), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2010).

■ ¶ 108 Cuesta–Rodriguez claims that Oklahoma's use of lethal injection is cruel

taken directly from Instruction No. 4–80, OUJI–CR(2d) (Supp.1997), which explicitly provides that "[e]ven if you find that the aggravating circumstances outweigh the mitigating circumstances, you *may* impose a sentence of imprisonment for life with the possibility of parole or imprisonment for life without the possibility of parole" (emphasis added). Based on this language, there is no reasonable possibility jurors could have read Instruction No. 6 as preventing them from considering life or life without parole as sentencing options if they found the existence of an aggravating circumstance.

18. Additionally, Rule 9.3(A), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2010), sets a one-hundred page limit on an appellant's brief-in-chief in death penalty cases. Cuesta–Rodriguez's brief is one-hundred pages long and the pretrial motions he attempts to incorporate into the brief total at least fifteen pages. If these materials from the trial court record are incorporated by reference, the brief would exceed the one-hundred page limit. Our rule sets page limits. This rule may not be circumvented by incorporating pages by reference from sources outside the brief.

and unusual punishment in violation of the Federal and Oklahoma Constitutions. See U.S. Const. amend. VIII; Okla. Const. art. II, § 9. Cuesta–Rodriguez contends that one of the drugs used in the death penalty in Oklahoma (pancuronium bromide) may leave an inmate awake as two other unnamed drugs used in the process cause him to suffocate slowly and painfully. He also argues that Oklahoma's death penalty protocol is flawed because: (1) it shields the identities of those administering the drugs; (2) leaves certain decisions surrounding administration of the lethal drugs up to the individuals administering them; and (3) there is no backup plan should a doctor be unavailable to assist in the execution as a result of medical ethics or other circumstances. Cuesta–Rodriguez did not raise this issue in the trial court. The issue is therefore waived for all but plain error. *Simpson v. State*, 1994 OK CR 40, ¶ 2, 876 P.2d 690, 693.

¶ 109 In support of his position about which drugs and procedures are used in the Oklahoma lethal injection process, Cuesta–Rodriguez refers to a document entitled "Procedures for the Execution of Inmates Sentenced to Death." With regard to the alleged inadequacies of the drug pancuronium bromide, Cuesta–Rodriguez refers to a *New York Times* article. We are unable to find the procedure document cited by Cuesta–Rodriguez anywhere in the record. Nor are we able to find any mention of the drug pancuronium bromide in the record, nor any listing of the names of other drugs that are used, nor any record information about potential inadequacies of pancuronium bromide when used individually or in combination with the two unnamed drugs to which Cuesta–Rodriguez refers. Cuesta–Rodriguez has not provided a sufficient record to allow us to address this issue. *See Warner*, 2006 OK CR 40, ¶ 148 144 P.3d at 883 (finding that where record does not set out Oklahoma's lethal injection protocol, an appellant's claim of Eighth Amendment violation based on reference to pancuronium bromide and "two other" drugs and supported by newspaper articles is speculative "at best"). Consequently, on this record, we cannot find a substantial violation of any constitutional right against cruel or unusual punishment.

*See Cardenas v. State*, 1985 OK CR 21, ¶ 7, 695 P.2d 876, 879 ("[i]t is the appellant's burden to include enough of the record on appeal to permit the review of alleged error"). There is no plain error. *See Hogan v. State*, 2006 OK CR 19, ¶ 38, 139 P.3d 907, 923 (holding that plain error requires, among other things, showing that error affected substantial right); 20 O.S.2001, § 3001.1 (prohibiting setting aside of judgment unless reviewing court is of opinion that alleged error constitutes substantial violation of constitutional right).

## 20.

### Cumulative Error

¶ 110 Cuesta–Rodriguez claims that even if no single error in his case warrants reversal, an accumulation of errors denied him a fair trial and sentence determination. This Court has held that when there are numerous irregularities during the course of [a] trial that tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors was to deny the defendant a fair trial. *DeRosa*, 2004 OK CR 19, ¶ 100, 89 P.3d at 1157 (quoting *Lewis v. State*, 1998 OK CR 24, ¶ 63, 970 P.2d 1158, 1176). While we conclude that Cuesta–Rodriguez's trial was not error free, the errors do not require relief because when considered in the aggregate, they did not render his trial fundamentally unfair, taint the jury's verdict, or render the sentencing unreliable. Any errors were harmless beyond a reasonable doubt, individually and cumulatively.

## 21.

### Mandatory Sentence Review

¶ 111 Title 21 O.S.2001, § 701.13 requires this Court to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance." After conducting this review, this Court may order any corrective relief that is warranted

or affirm the sentence. 21 O.S.2001, § 701.13(E).

¶ 112 Having reviewed the record in this case, we find that Cuesta–Rodriguez's death sentence was not the result of trial error, prosecutorial misconduct, or improper evidence or witness testimony and that Cuesta–Rodriguez's death sentence was not imposed under the influence of any arbitrary factor, passion, or prejudice.

¶ 113 The jury's finding that Cuesta–Rodriguez posed a continuing threat to society and that he murdered Olimpia Fisher in a heinous, atrocious, or cruel manner, is amply supported by the evidence. Weighing the valid aggravating circumstances and evidence against the mitigating evidence, we find, as did the jury below, that the aggravating circumstances outweigh the mitigating circumstances.

### DECISION

¶ 114 The Judgment and Sentence of the district court is **AFFIRMED**. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2010), the **MANDATE** is **ORDERED** issued upon delivery and filing of this decision.

C. JOHNSON, P.J., and LEWIS, J., and TAYLOR, A.J., concur.

LUMPKIN, J., concurs in results.

LUMPKIN, Judge, concurs in results.

¶ 1 I concur in the Court's decision to affirm the judgment and sentence in this case. However, I have some disagreement in how the Court arrives at those decisions.

¶ 2 I disagree with the majority's reliance upon footnote 48 of *Malone v. State*, 2007 OK CR 34, ¶ 22 n. 48, 168 P.3d 185, 197 n. 48, in its disposition of Proposition I. "While there are exceptions, statements in footnotes are generally regarded as dicta, having no precedential value." *Cannon v. State*, 1995 OK CR 45, ¶ 2, 904 P.2d 89, 108 (Lumpkin, J., concurring in result) *citing Wainwright v. Witt*, 469 U.S. 412, 422, 105 S.Ct. 844, 851, 83 L.Ed.2d 841 (1985). Further, I continue to maintain, as I set forth in *Malone*, that our prior case law regarding the legal standard used to determine when an instruction on voluntary intoxication is warranted is not inconsistent. *Malone*, 2007 OK CR 34, ¶ 3, 168 P.3d at 233–34 (Lumpkin, P.J., concurring in part/dissenting in part). *See Taylor v. State*, 2000 OK CR 6, ¶ 19, 998 P.2d 1225, 1230; *Jackson v. State*, 1998 OK CR 39, ¶ 65, 964 P.2d 875, 892.

¶ 3 As to Proposition II, it should be noted that the normal experiences and qualifications of laymen likely do not provide an understanding of the effects of illicit drug usage on one's ability to control behavior, to think rationally, and to form an intent to kill. *See Coddington v. State*, 2006 OK CR 34, ¶ 42–43, 142 P.3d 437, 449–50 (holding that medical physician could properly testify that defendant would have been unable to form the requisite deliberate intent of malice aforethought due to cocaine intoxication.). "Expert opinion testimony ... is based on 'scientific, technical, or other specialized knowledge' and can be provided only by a witness who is 'qualified as an expert,' in the field at issue, 'by knowledge, skill, experience, training, or education.'" *Malone*, 2007 OK CR 34, ¶ 81, 168 P.3d at 217; (*quoting* 12 O.S.Supp.2002, § 2702). I agree that there is nothing in the record to show that Dr. Choca, a psychologist with a Ph.D., was qualified to testify as to the effects of combining alcohol and the steroid diprospan.

¶ 4 As to Proposition V, I disagree with the majority's analysis of Appellant's claim that the admission of the Chief Medical's Examiner's testimony regarding an autopsy performed by his predecessor in office and the admission of certain diagrams from the autopsy violated Appellant's right to confrontation. I agree that the Former Chief Medical Examiner's autopsy report is not afforded any special status and is considered testimonial for Sixth Amendment confrontation purposes under *Crawford v. Washington*, 541 U.S. 36, 47 n. 2, 124 S.Ct. 1354, 1361 n. 2, 158 L.Ed.2d 177 (2004), and *Melendez–Diaz v. Massachusetts*, 557 U.S. ––––, 129 S.Ct. 2527, 2538, 174 L.Ed.2d 314 (2009). However, to properly ascertain whether Appellant's right to Confrontation was violated we must determine whether the State's expert is simply a conduit for an absent witness's conclusions or

whether the State's expert is offering his own conclusions, based in part on the data, analysis and conclusions of other professionals reasonably relied upon by experts in the field. *See Vann v. State,* 229 P.3d 197, 206 (Alaska App., 2010) ("when the government's expert is simply a conduit for an absent witness's analysis, courts find a violation of the confrontation clause; but when the government's expert offers their own analysis, based in part on test data obtained from other people, courts find that the confrontation clause is satisfied."); *see also United States v. Johnson,* 587 F.3d 625, 636 (4th Cir.2009) ("An expert witness's reliance on evidence that *Crawford* would bar if offered directly only becomes a problem where the witness is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation.").

¶ 5 This Court previously adopted a similar rule in *Marshall v. State,* 2010 OK CR 8, ¶ 30, 232 P.3d 467, 475, to wit:

> While Rules of Evidence cannot trump the Sixth Amendment, *Crawford,* 541 U.S. at 61, 124 S.Ct. at 1370, *Melendez–Diaz* does not do away with 12 O.S.2001, § 2703. ( [A]s a matter of expert opinion testimony, a physician's reliance on reports prepared by other medical professionals is plainly justified in light of the custom and practice of the medical profession. Doctors routinely rely on observations reported by other doctors … and it is unrealistic to expect a physician, as a condition precedent to offering opinion testimony to have performed every test, procedure, and examination himself). *Avila,* 912 N.E.2d at 1028–1029. However, § 2703 must be read in conjunction with the Confrontation Clause. This requires the expert witness testimony must be confined to his or her own opinions and the expert must be available for cross-examination.

The majority fails to explain why this analysis is not used in the present case. Appellate courts should be clear and consistent in establishing guidelines for the judges of the District Court. *Hampton v. State,* 2009 OK CR 4, ¶ 1, 203 P.3d 179, 189 (Lumpkin, J., concurring in part/dissenting in part).

¶ 6 In *Marshall,* we were presented with the situation where an expert witness was simply a conduit to gain admission of a non-testifying expert's report and the conclusions therein. *Id.,* 2010 OK CR 8, ¶ 29, 232 P.3d at 475. The expert testified solely to the findings of the non-testifying expert's report, he was repeatedly asked about the non-testifying expert's findings, answered those questions by reading from the non-testifying expert's report, and did not offer his own opinions concerning the findings. *Id.* We determined that allowing the expert to testify to the findings contained in the non-testifying expert's report violated the Confrontation Clause. *Id.,* 2010 OK CR 8, ¶ 31, 232 P.3d at 475–76.

¶ 7 The circumstances in *Marshall* must be distinguished from the instance where an expert testifies to his or her own opinions. When an expert testifies to his or her own opinions, then evidence may also be offered as the basis of the expert's opinion. *Crawford* and its progeny are not applicable to evidence offered as the basis of an expert's opinion because such evidence is not offered for the truth of the matter asserted. "*Crawford* does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Andrew v. State,* 2007 OK CR 23, ¶ 31, 164 P.3d 176, 189; *citing Crawford,* 541 U.S. at 59 n. 9, 124 S.Ct. at 1369 n. 9, *citing Tennessee v. Street,* 471 U.S. 409, 414, 105 S.Ct. 2078, 2081–82, 85 L.Ed.2d 425 (1985). Evidence offered as the basis of an expert's opinion is not being offered for the truth of the matter asserted. *Lewis v. State,* 1998 OK CR 24, ¶ 22, 970 P.2d 1158, 1167–68. "[A] limiting instruction clarifying that the evidence can only be used to evaluate the credibility of the testifying expert's opinion is required." *Id., citing Ake v. State,* 1989 OK CR 30, 778 P.2d 460, 467; *see also* OUJI–CR(2d) 9–42A (Supp.2000).

¶ 8 An expert witness may properly testify to his or her own conclusions based on the testing of other professionals if reasonably relied upon by experts in the field. *Mar-*

*shall,* 2010 OK CR 8, ¶ 30, 232 P.3d at 475–76; 12 O.S.Supp.2002, § 2703.

The Oklahoma Evidence Code places few restrictions on the information an expert may rely upon to form his or her opinions. In referring to such information, 12 O.S.1991, § 2703 specifically provides that "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Accordingly, under section 2703 an expert may rely upon information considered to be hearsay if this information is of a type reasonably relied upon by experts in forming their opinions. The Code also provides, "[t]he expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may be required to disclose the underlying facts or data on cross-examination." 12 O.S.1991, § 2705. Appellant argues that section 2705 provides no statutory authority for revealing to the jury the reasons underlying Dr. Call's opinion. While section 2705 only mandates that this information be divulged to the jury if required by the judge or on cross-examination, it does not preclude the admission of such absent the trial court's request or on direct examination.

*Lewis,* 1998 OK CR 24, ¶ 19, 970 P.2d at 1166–67. In *Lewis,* we found that it was permissible for a psychologist to rely, in part, upon hospital records and information given to him by a physician, while forming his opinion of the defendant's mental state. *Id.,* 1998 OK CR 24, ¶ 20, 970 P.2d at 1167. Likewise, we have found that a discharge summary from Eastern State Hospital and an unsigned psychological evaluation which the expert reasonably relied upon in arriving at her opinion were properly admitted into evidence. *Humphreys v. State,* 1997 OK CR 59, ¶¶ 26–28, 947 P.2d 565, 575. It is permissible for an expert to rely on professional studies of which the expert is aware. *Revilla v. State,* 1994 OK CR 24, ¶ 21, 877 P.2d 1143, 1150–51. A medical expert may reasonably rely upon the diagnoses of other medical professionals in forming his opinion. *Ake,*

1989 OK CR 30, ¶¶ 30–31, 778 P.2d at 467. Again, the purpose of evidence of the basis of the opinion is solely to permit the jury to determine the credibility of the expert's opinion. *Id.,* 1989 OK CR 30, ¶ 31, 778 P.2d at 467.

¶ 9 Thus, the testifying expert need not go back and perform the non-testifying expert's examination, testing and analysis if other professionals in the field would reasonably rely upon the non-testifying expert's examination, testing and analysis. Instead, the testifying expert may arrive at his own analysis and conclusions reasonably based upon the work of the non-testifying expert.

¶ 10 Such a conclusion is consistent with the United States Supreme Court's conclusion in *Melendez–Diaz* that "we do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." *Melendez–Diaz,* 129 S.Ct. at 2532 n. 1.

¶ 11 The present case illustrates the necessity of application of the conduit test. Dr. Gofton reasonably relied upon the photographs taken of Fisher, Dr. Jordan's findings, diagrams and report in forming his own opinions. Dr. Gofton testified as to his own opinion regarding the timing, severity and survivability of the different wounds; the manner, cause, and mechanism of death; the amount of blood where Fisher was discovered; and the probability that Fisher remained conscious after the second gunshot wound. Within this testimony Dr. Gofton often referenced Dr. Jordan's findings and his diagrams as a basis for his opinions. These opinions and the evidence introduced as the basis for them were properly admitted and did not violate the Confrontation Clause. Dr. Gofton was subject to cross examination and the basis for his opinions was not introduced for the truth of the matter asserted but solely to permit the jury to determine the credibility of the expert's opinion. *Ake,* 1989 OK CR 30, ¶ 31, 778 P.2d at 467.

¶ 12 However, a fair amount of Dr. Gofton's testimony consisted of his parroting the

report of Dr. Jordan. Dr. Gofton did not give his own opinion but merely testified as to Dr. Jordan's findings or conclusions. This evidence was not presented as the basis for any of Dr. Gofton's opinions. It was admitted to prove the truth of the matter asserted and did not weigh on the credibility of Dr. Gofton's opinions. This type of conduit testimony is improper and violated Appellant's right to Confrontation.

¶ 13 I agree with the majority that the Confrontation Clause violation is harmless beyond a reasonable doubt. *Marshall,* 2010 OK CR 8, ¶ 31, 232 P.3d at 476. Those portions of Dr. Gofton's testimony where he was simply a conduit for Dr. Jordan's report and conclusions were not that important to the prosecution's case, the testimony was cumulative of other evidence in the case, the conduit testimony was corroborated by other evidence at trial, and the great weight of the evidence supported the jury's determination of both guilt and that Fisher consciously suffered before her death. *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986).

¶ 14 As to Proposition VIII, this Court has previously approved the struck juror method for seating a jury in a criminal case. *Jones v. State,* 2006 OK CR 5, ¶¶ 7–8, 128 P.3d 521, 533.

¶ 15 As to Proposition XI, I further note that this Court conducts a mandatory sentence review in every case where a sentence of death was imposed that encompasses the very circumstances that Appellant alleges. 21 O.S.2001, § 701.13. As discussed in the mandatory sentence review, Appellant's sentence was not imposed under the influence of any arbitrary factor, passion or prejudice.

¶ 16 As to Proposition XV, I disagree with the majority's assumption that Dr. Gofton's testimony as to the length of time Fisher may have remained conscious was improperly admitted. Appellant complains that Dr. Gofton's opinion as to the length of time Fisher may have remained conscious was different than that described by Dr. Jordan in his report. Within this claim Appellant concedes that Dr. Gofton rendered his own opinion and was not simply a conduit for Dr. Jordan's report. As such, the testimony was

proper and did not violate the Confrontation Clause. *Marshall,* 2010 OK CR 8, ¶¶ 29–30, 232 P.3d at 475–76.

¶ 17 As to Proposition XVI, the opinion goes through a plain error analysis without ever naming it or citing such authority. Appellant's failure to make an offer of proof of the testimony that he wanted to present beyond that authorized by the pre-trial ruling waives all but plain error. *Simpson v. State,* 1994 OK CR 40, ¶¶ 10–11, 876 P.2d 690, 694–95; 12 O.S.2001, § 2104(A)(2) ("If the ruling is one excluding evidence, the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked."). I agree that plain error did not occur.

¶ 18 As to Proposition XIX, subsection H, this Court has previously rejected claims that Oklahoma's lethal injection protocol violates the Eighth Amendment prohibition against cruel and unusual punishment. *Malicoat v. State,* 2006 OK CR 25, ¶¶ 2–11, 137 P.3d 1234, 1235–39.